**STUEVE BROS. FARMS, LLC et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**No. 11–799 L.**

United States Court of Federal Claims.

Oct. 26, 2012.

Robert H. Freilich, Los Angeles, CA, for plaintiff.

Joshua P. Wilson, Trial Attorney, with whom was Ignacia S. Moreno, Assistant Attorney General, Natural Resources Section,

Environment and Natural Resources Division, United States Department of Justice, Washington, DC, for defendant.

## OPINION

HEWITT, Chief Judge.

### I. Background

This is an action brought by Stueve Bros. Farms, LLC and Mill Creek Farming Associates, LLC (plaintiffs) for just compensation pursuant to the Takings Clause of the Fifth Amendment to the United States Constitution. *See* Compl. (Complaint or Compl.), Docket Number (Dkt. No.) 1, ¶¶ 1–2, 5. The court dismissed plaintiffs' claims pursuant to Rule 12(b)(6) of the Rules of the United States Court of Federal Claims (RCFC). *Stueve Bros. Farms v. United States* (the court's opinion or *MTD Op.*), 105 Fed.Cl. 760, 768 (2012). Judgment was entered dismissing plaintiffs' complaint on July 3, 2012. J., Dkt. No. 15. This Opinion addresses plaintiffs' request for reconsideration or, in the alternative, for leave to file an amended complaint.

Plaintiffs own land within the Prado Dam Flood Control Basin (plaintiffs' property). *MTD Op.*, 105 Fed.Cl. at 761–62. When the Prado Dam was completed in 1941, it was anticipated that releases of water from the dam could inundate portions of plaintiffs' property. *Id.* After the dam was built, the government acquired flowage easements permitting it to flood plaintiffs' property to an elevation of 556 feet above sea level (the existing easements). *Id.* Beginning in or around 1976, the government, acting through the United States Army Corps of Engineers (the Corps), began a plan to carry out a series of improvements (the Project) that would, among other things, raise the flood inundation line associated with releases of water from the Prado Dam by ten feet, to 566 feet above sea level. *Id.* The Project was

to be undertaken in three phases. *Id.* The first phase—the elevation of the Prado Dam and the Prado Dam Reservoir—was completed on or around December 1, 2008. *Id.*

The legislation authorizing the first phase of the Project provided that "non-Federal interests ... shall provide all lands, easements [and] rights-of-way ... required for the project." *Id.* at 762 n. 3 (quoting Compl. ¶ 13) (internal quotation marks omitted). Pursuant to an agreement with defendant, Orange County, the Orange County Board of Supervisors and the Orange County Flood Control District (the Orange County Governmental Entities) were to be responsible for acquiring, by purchase or condemnation, fee simple title to or flowage easements over all property required for the Project, including plaintiffs' property. *See id.* at 761–63; Compl. ¶ 14. The agreement states that neither the government nor the Orange County Governmental Entities were to act as the other's agent, employee or officer. Compl. ¶ 16. The Orange County Governmental Entities have acquired " 'numerous parcels neighboring and encircling Plaintiffs' Property,' " and offered to purchase plaintiffs' property, but negotiations were unsuccessful. *MTD Op.*, 105 Fed.Cl. at 762–63 (quoting Compl. ¶ 28). Plaintiffs do not allege that the Orange County Governmental Entities have instituted condemnation proceedings against their property.

In 2003 the Corps released flood plain maps [1] showing the 566–foot flood inundation line. *Id.* In response to these maps, the city of Chino rezoned the portion of plaintiffs' property between 556 feet and 566 feet above sea level for "passive recreation and open space use." *Id.* (internal quotation marks omitted). Plaintiffs allege that, if the city of Chino had not zoned the portion of plaintiffs' property between 556 feet and 566 feet above sea level for such use, every property in the

---

**1.** Plaintiffs refer to these maps as "[m]ap[s] of [r]eservation" and provide citations to authorities that discuss the operation of maps of reservation. *See* Pls.' Br. in Resp. to Def.'s RCFC 12(b)(6) Mot. to Dismiss the Compl. (Plaintiffs' Response or Pls.' Resp.), Docket Number (Dkt. No.) 10, at 27 stating that a map of reservation " 'assures that land needed for future streets will be available at bare land prices by requiring that

no development can occur within its lines for a reasonable period of time' " (quoting Joseph C. Kucirek & J.H. Beuscher, *Wisconsin's Official Map Law[:] Its Current Popularity and Implications for Conveyancing and Planning*, 1957 Wis. L. Rev. 176, 177 (misquotation in original)). Plaintiffs do not explain why they believe that the government's flood plain maps function as maps of reservation.

city would have lost its eligibility for federal flood insurance. *See id.*

In 2009 the city of Chino amended its zoning plan to allow plaintiffs to develop the portion of their property above an elevation of 566 feet for "mixed-use residential, commercial, office and industrial uses" and granted plaintiffs permission to use soil from a portion of their property located below the 566–foot flood inundation line to raise a 93.3–acre portion of their property above the 566–foot flood inundation line. *Id.* (internal quotation marks omitted). Plaintiffs have received approval from the city of Chino to develop the portion of their property above 566 feet above sea level. *Id.* The Corps, in its letter approving plaintiffs' plan for a " 'high density, mixed-use development,' " acknowledged that it had reviewed the proposal in light of " 'the future flood control easement' extending to an elevation of 566 feet" but did not state when such an easement would be acquired, if at all. Compl. ¶ 26 (quoting the letter from the Corps).

Plaintiffs do not allege that the government has flooded their property to the new 566–foot flood inundation line or that the government has ever exercised its right under the existing easements to flood their property to an elevation of 556 feet above sea level. *See MTD Op.,* 105 Fed.Cl. at 761 (stating that "plaintiffs' claims are premised on the apprehension of future flooding rather than on flooding that has already occurred" (internal quotation marks omitted)). Neither do plaintiffs allege that their property will be inundated to the new 566–foot flood inundation line on a recurring basis or at all. Instead, plaintiffs' complaint focuses on the possibility that their property could be inundated in the future as a result of the Project. *Id.* Plaintiffs allege that the government "has 'inversely condemned a permanent physical and title flowage easement across the Property ... [by] authorizing flowage of impounded water from the newly elevated Prado Dam and Reservoir[,] ... making the vast majority of Plaintiffs' Property subject to flooding and unfit for development of any kind.' " *Id.* (quoting Compl. ¶ 34).

Defendant filed a motion to dismiss under RCFC 12(b)(6), contending that "a landowner asserting that government action has inversely condemned a flowage easement over his property—as Plaintiffs allege here—must point to permanent flooding, or multiple, actual physical invasions of water that are inevitably recurring." United States' Mot. to Dismiss (defendant's Motion or Def.'s Mot.), Dkt. No. 7, at 8–9 (internal quotation marks omitted).

Plaintiffs responded that, regardless of whether flooding had taken place, the government had taken a flowage easement "by subjecting Plaintiff[s'] property to the government's right to flood up to 566 feet above sea level." Pls.' Br. in Resp. to Def.'s RCFC 12(b)(6) Mot. to Dismiss the Compl. (plaintiffs' Response or Pls.' Resp.), Dkt. No. 10, at 13. Plaintiffs contended that "[i]t is the *easement* that is the permanent physical taking, not the flooding that will eventually occur due to the raising of the elevation of the Prado Dam." *Id.* at 11. Plaintiffs elaborated on their contention as follows: "[I]t is the contemplation of the taking of an easement involving the future right to flood pursuant to the authorization by Congress to do so ..., coupled with the actual construction of the dam that will release the flood waters in the future, that constitutes a taking of a flowage easement...." *Id.* at 15 (construing *Hurley v. Kincaid* (*Hurley*), 285 U.S. 95, 52 S.Ct. 267, 76 L.Ed. 637 (1932)). Plaintiffs devoted a substantial portion of their Response to supporting their analysis of *Hurley* with discussion of other "categories of physical title takings cases" in which plaintiffs believe that a taking may be found "without actual physical flooding or other actual physical intrusion, invasion or trespass." *Id.* at 3; *see also id.* at 22–31.

The court granted defendant's Motion, noting that plaintiffs had misinterpreted *Hurley* and the cases that followed it, and that "plaintiffs' claims are premised on the 'apprehension of future flooding' rather than on flooding that has actually occurred and which is sufficiently substantial to warrant analysis as a taking rather than a tort." *MTD Op.,* 105 Fed.Cl. at 761; *see id.* at 766–67. To avoid repetition, familiarity with the court's opinion—which described plaintiffs' allega-

tions and the parties' arguments in detail—is presumed.

Now before the court is "Plaintiffs' RCFC 59(a)(1)(A)-(B) Motion for Reconsideration of (1) July 3, 2012 Judgment and (2) July 2, 2012 Opinion and Order Directing Entry of Judgment Granting Defendant's RCFC 12(b)(6) Motion to Dismiss the Complaint" (plaintiffs' Motion or Pls.' Mot.), Dkt. No. 16, filed July 28, 2012, attached to which, among other documents, is plaintiffs' Proposed First Amended Complaint (Amended Complaint or Am. Compl.), Dkt. No. 16–7. Also before the court is Memorandum of the United States in Response to Plaintiffs' Motion for Reconsideration (defendant's Response or Def.'s Resp.), Dkt. No. 18, filed August 22, 2012.[2]

In their Motion, plaintiffs present evidence that they state was previously unavailable and contend that—in light of legal theories not presented in plaintiffs' Complaint or Response—plaintiffs' allegations state a claim upon which relief can be granted. *See infra* Part III. Plaintiffs request that the court reconsider its opinion dismissing their claims or permit them amend their Complaint to incorporate the evidence that, they allege, was previously unavailable and to assert their claims under legal theories of recovery not presented in their Complaint or Response. For the reasons set forth below, plaintiffs' Motion is DENIED except to the extent stated in Part IV.

## II. Legal Standards

### A. Motions to Dismiss Under RCFC 12(b)(6)

A motion to dismiss under RCFC 12(b)(6) asserts a "failure to state a claim upon which relief can be granted." RCFC 12(b)(6). To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that

is plausible on its face.'" *Ashcroft v. Iqbal* (*Iqbal*), 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly* (*Twombly*), 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). When ruling on a Rule 12(b)(6) motion to dismiss, the court "must accept as true all the factual allegations in the complaint" and make "all reasonable inferences in favor of the non-movant." *Sommers Oil Co. v. United States*, 241 F.3d 1375, 1378 (Fed.Cir.2001). However, "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937.

### B. Motions for Reconsideration Under RCFC 59(a)

Rule 59(a) provides that reconsideration may be granted as follows: "(A) for any reason for which a new trial has heretofore been granted in an action at law in federal court; (B) for any reason for which a rehearing has heretofore been granted in a suit in equity in federal court; or (C) upon the showing of satisfactory evidence, cumulative or otherwise, that any fraud, wrong, or injustice has been done to the United States." RCFC 59(a)(1).

 The moving party must support its motion for reconsideration by a showing of "exceptional circumstances justifying relief," *Fru–Con Constr. Corp. v. United States* (*Fru–Con*), 44 Fed.Cl. 298, 300 (1999), based on "a manifest error of law or mistake of fact," *Henderson Cnty. Drainage Dist. No. 3 v. United States* (*Henderson*), 55 Fed.Cl. 334, 337 (2003); *see Principal Mut. Life Ins. Co. v. United States*, 29 Fed.Cl. 157, 164 (1993). "Specifically, the moving party must show: (1) the occurrence of an intervening change in the controlling law; (2) the availability of previously unavailable evidence; or

**2.** Plaintiffs also filed a reply brief. *See* Pls.' Reply Br. in Supp. of Pls.' Mot. for Recons. (plaintiffs' Reply), Dkt. No. 19. Rule 59 of the Rules of the United States Court of Federal Claims (RCFC), which governs reconsideration, provides that "[a] response to any motion under this rule may be filed only at the court's request and within the time specified by the court." RCFC 59(f). Rule 59 does not provide for the filing of a reply. *See* RCFC 59. The court di-

rected defendant to file a response to plaintiffs' motion for reconsideration, pursuant to Rule 59, but did not direct plaintiffs to file a reply to that response. *See* Order of Aug. 8, 2012, Dkt. No. 17. Because there is no provision for the filing of plaintiffs' Reply in the RCFC or the court's order, and given plaintiffs' failure to request leave to file it, the court will disregard plaintiffs' Reply.

(3) the necessity of allowing the motion to prevent manifest injustice." *Matthews v. United States,* 73 Fed.Cl. 524, 526 (2006). Where a party seeks reconsideration on the ground of manifest injustice, it cannot prevail unless it demonstrates that any injustice is "apparent to the point of being almost indisputable." *Pac. Gas & Electric Co. v. United States,* 74 Fed.Cl. 779, 785 (2006), *aff'd in part and rev'd in part,* 536 F.3d 1282 (Fed. Cir.2008). In other words, "manifest" is understood as "clearly apparent or obvious." *Ammex, Inc. v. United States,* 52 Fed.Cl. 555, 557 (2002), *aff'd,* 384 F.3d 1368 (Fed.Cir. 2004).

█ "A motion for reconsideration is not intended ... to give an 'unhappy litigant an additional chance to sway' the court." *Matthews,* 73 Fed.Cl. at 525 (quoting *Froudi v. United States,* 22 Cl.Ct. 290, 300 (1991)). A motion for reconsideration is not an opportunity to make new arguments that could have been made earlier; "an argument made for the first time in a motion for reconsideration comes too late, and is ordinarily deemed waived." *Bluebonnet Sav. Bank, F.S.B. v. United States (Bluebonnet),* 466 F.3d 1349, 1361 (Fed.Cir.2006); *Gen. Electric Co. v. United States,* 189 Ct.Cl. 116, 118, 416 F.2d 1320, 1322 (1969) (per curiam) (stating that, in general, "requests for post-decision relief will be rejected if the [movant] has, without sufficient excuse, failed to make his point prior to the decision").[3]

█ "The decision whether to grant reconsideration lies largely within the discretion of the [trial] court." *Yuba Natural Res., Inc. v. United States,* 904 F.2d 1577, 1583 (Fed.Cir. 1990). Courts must address motions for reconsideration with "exceptional care." *Carter v. United States,* 207 Ct.Cl. 316, 318, 518 F.2d 1199, 1199 (1975) (per curiam).

### C. Motions to Amend Pleadings Under RCFC 15(a)(2)

█ With certain exceptions not applicable here, "a party may amend its pleading only with the opposing party's written consent or the court's leave." RCFC 15(a)(2). However, "The Federal Rules [of Civil Procedure][4] reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits." *Conley v. Gibson,* 355 U.S. 41, 48, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), *abrogated on other grounds by Twombly,* 550 U.S. at 563, 127 S.Ct. 1955. Accordingly, "[t]he court should freely give leave when justice so requires." RCFC 15(a)(2).

█ As the United States Supreme Court (Supreme Court) has explained:

> If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be "freely given."

*Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); *see, e.g., Sanofi–Aventis v. Apotex Inc.,* 659 F.3d 1171, 1181–82 (Fed.Cir.2011) (quoting same and finding denial of amendment proper where the amendment would have been futile).

█ "When a party faces the possibility of being denied leave to amend on the ground of futility, that party must demonstrate that its pleading states a claim on which relief could be granted...." *Kemin Foods, L.C. v.*

---

**3.** The United States Court of Claims (Court of Claims) is the predecessor court to this court and a predecessor to the United States Court of Appeals for the Federal Circuit (Federal Circuit). When acting in its appellate capacity, the Court of Claims created precedent that is binding on this court. *South Corp. v. United States,* 690 F.2d 1368, 1369 (Fed.Cir.1982) (en banc).

**4.** The RCFC "generally follow the Federal Rules of Civil Procedure" (FRCP). *C. Sanchez & Son, Inc. v. United States,* 6 F.3d 1539, 1541 n. 2 (Fed.Cir.1993). The court therefore relies on authorities interpreting the FRCP as well as those interpreting the RCFC.

**476**

*Pigmentos Vegetales del Centro S.A. de C.V.*, 464 F.3d 1339, 1354–55 (Fed.Cir.2006).

### D. Amendment of Complaints After Entry of Judgment

The United States Court of Appeals for the Federal Circuit (Federal Circuit) has not determined the standard to be applied when a party moves to amend its pleadings after judgment has been entered,[5] and there appears to be a split of authority on the subject. "Most courts faced with the problem have held that once a judgment is entered the filing of an amendment cannot be allowed until the judgment is set aside or vacated under Rule 59 or Rule 60" of the Federal Rules of Civil Procedure. 6 Charles Alan Wright, Arthur R. Miller, Mary Kay Kane & Richard L. Manus, *Federal Practice and Procedure* § 1489 (3d ed. 2012). "As a practical matter, the motions under [Rule 60 and Rule 15] will be made simultaneously and decided together, since it would be a needless formality for the court to grant the motion to reopen the judgment only to deny the motion for leave to amend." *Id.* (footnote omitted).

In some circuits, courts apply the more lenient standard set out in Rule 15, governing the amendment of complaints to determine both whether amendment is appropriate and whether to set aside or vacate the judgment under Rule 59 or Rule 60. *See, e.g., Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 471 (4th Cir.2011) ("To determine whether vacatur is warranted, . . . the court need not concern itself with [Rule 59 or Rule 60's] legal standards. The court need only ask whether the amendment should be granted, just as it would on a prejudgment motion to amend pursuant to [Rule 15(a)]."); *Dussouy v. Gulf Coast Inv. Corp.*, 660 F.2d 594, 597 n. 1 (5th Cir.1981) ("[T]he disposition of the plaintiff's motion to vacate under rule 59(e) should be governed by the same considerations controlling the exercise of discretion under rule 15(a)."). In these circuits, courts consider the factors relevant to amendment, including futility, prejudice and bad faith. *See, e.g., Katyle*, 637 F.3d at 471.

In other circuits, courts apply both the more rigorous standard set out in Rule 59 and Rule 60 (to determine whether to set aside or vacate the judgment) and the more lenient standard in Rule 15 (to determine whether to allow amendment of the complaint). *See, e.g., Palmer v. Champion Mortg.*, 465 F.3d 24, 30 (1st Cir.2006) (noting that, if the plaintiff's request to amend was filed before judgment was entered "the district court would have had to evaluate the plaintiff's request under the liberal standard of Fed.R.Civ.P. 15(a)"); *Ahmed v. Dragovich* (*Dragovich* ), 297 F.3d 201, 207–08 (3d Cir. 2002) ("Although Rule 15 vests the District Court with considerable discretion to permit amendment 'freely . . . when justice so requires,' the liberality of the rule is no longer applicable once judgment has been entered. At that stage, it is Rules 59 and 60 that govern the opening of final judgments." (omission in original) (internal citation omitted) (quoting Fed.R.Civ.P. 15(a))); *First Nat'l Bank of Louisville v. Cont'l Ill. Nat'l Bank & Trust Co. of Chi.*, 933 F.2d 466, 468 (7th Cir.1991) ("[T]he presumption in favor of liberality in granting motions to amend, Fed. R.Civ.P. 15(a), is reversed after judgment has been entered."). In these circuits, courts may deny both the motion to reopen the judgment and the motion to amend the complaint if the proposed amendment would be futile. *See, e.g., Dragovich*, 297 F.3d at 209.

### III. Discussion

#### A. Reconsideration Is Warranted Only Insofar as Plaintiffs Allege a Taking of the Land Occupied by Surveyor's Monuments

Pursuant to RCFC 59, plaintiffs seek reconsideration of the court's opinion dismiss-

---

**5.** The Federal Circuit has addressed this issue only in patent litigation, in which it applied the law of the regional circuit because the amendment of pleadings is not unique to patent law. *See Ohio Cellular Prods. Corp. v. Adams USA, Inc.* (*Ohio Cellular* ), 175 F.3d 1343, 1348–49 (Fed. Cir.1999) (applying the law of the Sixth Circuit), *rev'd on other grounds sub nom. Nelson v.* *Adams USA, Inc.*, 529 U.S. 460, 120 S.Ct. 1579, 146 L.Ed.2d 530 (2000); *cf. Datascope Corp. v. SMEC, Inc.*, 962 F.2d 1043, 1045 (Fed.Cir.1992) ("In review of an order denying a motion to amend, a subject which is not unique to patent law, we look to the law of the regional circuit." (internal quotation marks omitted)).

ing their claims on three grounds. First, plaintiffs contend that their allegations, supplemented with evidence discovered since the court's opinion, state a claim for a physical taking upon which relief can be granted. *See infra* Part III.A.1. Second, plaintiffs contend that the portion of the Project involving Prado Dam is complete-an assertion that plaintiffs believe strengthens their argument that a physical taking has occurred. *See infra* Part III.A.2. Finally, plaintiffs contend that, in light of legal theories not presented in their Complaint or in briefing in opposition to defendant's motion to dismiss, they have alleged a taking upon which relief can be granted. *See infra* Part III.A.3. For the reasons below, the court finds that reconsideration of its conclusion that the government has not taken a flowage easement across plaintiffs' property is not warranted. However, reconsideration is appropriate insofar as plaintiffs assert that, in light of newly-discovered evidence, the government has effected a physical taking of the portion of their property occupied by surveyor's monuments.

 1. The Proffered Evidence of the Placement of Surveyor's Monuments Warrants Limited Reconsideration

■ Plaintiffs state that "[p]reviously unavailable evidence has been discovered that [defendant] specifically directed and authorized the Orange County Governmental Entities" to record records of survey in 1991 and 1993, delineating the 566-foot flood inundation line. *See* Pls.' Mot. 6, 11. Plaintiffs claim that they learned from the records of survey that the Orange County Governmental Entities and the government had placed small brass surveyor's monuments both on plaintiffs' property and at the edge of plaintiffs' property to mark the 566-foot flood inundation line. *Id.* at 6–7, 12–13. There are six such monuments on plaintiffs' property, each measuring three and five-eighths inches in diameter. *Id.* at 6, 12–13; Am. Compl. ¶ 26. Plaintiffs do not state how many monuments were placed at the edge of their property. *See* Pls.' Mot. 6–7 (describing these monuments without providing a number); Am. Compl. ¶ 27 (same).

Plaintiffs contend that they did not know—and cannot be expected to have known—about the records of survey or the surveyor's monuments because the Orange County Governmental Entities failed to give plaintiffs notice of the survey and properly to record the records of survey within the chain of title for their property. *See* Pls.' Mot. 13. Plaintiffs contend that "the brass monuments were buried and hidden at the time they were set, as much as 2–feet below the surface, making it impossible for the Plaintiffs to visually or otherwise discover them." *Id.* at 15.

Plaintiffs state that the monuments placed on their property bear the following inscription:

 FOR L.A. DISTRICT U.S. ARMY
 CORP[S] OF ENGINEERS
 AND COUNTY OF ORANGE
 BY J.P. KAPP AND ASSOCIATES, INC.
 LS 5023
 566 FOOT INUNDATION LINE

*id.* at 6, and that the monuments placed at the edge of their property bear the following inscription:

 CORPS OF ENGINEERS—U.S. ARMY
 SURVEY MARK
 $250 DOLLAR FINE OR IMPRISONMENT FOR DISTURBING THIS MARK
 BOUNDARY LS 5023
 STATION DESIGNATION AGENCY
 YEAR &#95;&#95;&#95;&#95;

*id.* at 6–7.

The 1993 record of survey states, in relevant part: " 'This survey was performed to determine the limits of acquisition of real property required for enlarging Prado Dam. The survey was commissioned by the Orange County Environmental Management Agency based on criteria of the U.S. Army Corps of Engineers.' " *Id.* at 11 (emphasis omitted) (quoting 1993 record of survey). Plaintiffs contend that their discovery of the records of survey and surveyor's monuments warrants reconsideration of the court's dismissal of their Complaint. *See id.* at 6–15. According to plaintiffs, the government conceded in the briefing it filed in support of its Motion that "had there been a physical invasion or occu-

pation of Plaintiffs' Property, there would have been a physical taking." *Id.* at 8 (emphasis omitted) (citing Reply Mem. in Supp. of the United States' Mot. to Dismiss, Dkt. No. 13, at 1 ("But Plaintiffs' property has not been invaded or otherwise occupied by the Government.")). Plaintiffs contend that "[t]he implanting of all of these monument disks constitutes a physical invasion and occupation of Plaintiffs' Property." *Id.* at 7; *see also id.* at 8, 10 (stating same).

Plaintiffs appear to believe that the placement of the surveyor's monuments supports their claim for the physical taking of a flowage easement. *See* Am. Compl. ¶ 26 (stating that "[t]he implanting of the monuments constitute[s] . . . a physical taking of a flowage easement"). However, it is not clear whether plaintiffs also seek to assert a claim for a taking of the space occupied by the monuments. On the one hand, plaintiffs' Amended Complaint pleads only one cause of action: that the government has "inversely condemned a permanent physical and title flowage easement across the Property . . . [by] authorizing flowage of impounded water from the completed, elevated Prado Dam and Reservoir onto Plaintiffs' Property." *Id.* ¶ 50. This cause of action relates to damage alleged to have been caused by the risk of flooding, not by the occupation of a small portion of plaintiffs' property by surveyor's monuments. *See id.* ¶¶ 50–51. Plaintiffs seek the same measure of damages—$60,000,000—that they sought in their original Complaint, *compare id.* 22, *with* Compl. 16,[6] which was filed, according to plaintiffs, before plaintiffs were aware of the surveyor's monuments, *see* Pls.' Mot. 12. Plaintiffs also request "a judgment establishing the date of [the] tak[ing] of Plaintiffs' Property . . . as December 1, 2008." Am. Compl. 22. The date, December 1, 2008, corresponds to completion of the first phase of the Project—and therefore to plaintiffs' claim for physical taking of a flowage easement, *see id.* ¶ 46—rather than to the placement of the monuments, which occurred in 1992, *see id.* ¶¶ 23, 26–27; Pls.' Mot. 12.

On the other hand, plaintiffs allege that "[t]he implanting of the monuments constitute[s] a physical invasion and occupation of Plaintiffs' Property and a physical taking of a flowage easement." Am. Compl. ¶ 26. Plaintiffs' phrasing suggests that plaintiffs claim both the taking of a flowage easement and the taking of the land occupied by the surveyor's monuments. Although plaintiffs do not mention in their prayer for relief an alleged taking of the land occupied by the monuments, plaintiffs request that the court award "such other and further relief as the Court may deem just and proper." *Id.* at 23.

Defendant, interpreting plaintiffs to be arguing only that the placement of the surveyor's monuments strengthens their argument that the government has taken a flowage easement, *see* Def.'s Resp. 5, responds that "a physical taking is established by physical invasions of the type complained of," *id.* at 4. Defendant contends that "nowhere has the United States argued—and it is not the law—that a limited physical occupation of one type creates a taking that extends beyond the physical burdens imposed by the occupation itself. The occupation of a property by brass disks is not the taking of a flowage easement." *Id.* at 4–5.

■■■ Defendant is correct that the placement of surveyor's monuments does not effect a physical taking of a flowage easement. Under binding Supreme Court precedent, a physical taking by flooding occurs only when the flooding has been "actually experienced." *See Danforth v. United States,* 308 U.S. 271, 286, 60 S.Ct. 231, 84 L.Ed. 240 (1939) (stating that the government may effect a taking "by such construction as would put upon . . . land a burden, *actually experienced,* of caring for floods greater than it bore prior to the construction" (emphasis added)). Actions by the government that merely create an "apprehension of future flooding" are insufficient. *United States v. Sponenbarger,* 308 U.S. 256, 267–68, 60 S.Ct. 225, 84 L.Ed. 230 (1939). To

---

**6.** The prayers for relief at the end of plaintiffs' pleadings do not contain numbered paragraphs. *See* Compl., Dkt. No. 1, at 16–17; Proposed First Am. Compl. (Amended Complaint or Am. Compl.), Dkt. No. 16–7, at 22–23. The court therefore cites to these sections of plaintiffs' pleadings by page number.

the extent that the records of survey and the inscriptions on the brass monuments indicate that flooding or the acquisition of flowage easements might occur in the future, *see* Pls.' Mot. 6–7, those indications—like the flood plain maps, statements and other actions that the court examined in its opinion, *see MTD Op.*, 105 Fed.Cl. at 762–64, 767–68—support only an "apprehension of future flooding," *cf. Sponenbarger*, 308 U.S. at 267, 60 S.Ct. 225. They do not effect a physical taking of a flowage easement. *Cf. Poinsett Lumber & Mfg. Co. v. United States*, 91 Ct.Cl. 264, 265–67 (1940) (finding that the government did not effect a taking by partial construction of a flood control project and entry upon the plaintiffs' land to conduct surveys because "[t]he acts of the Government must constitute an actual invasion and dispossession of the use and occupancy of the property by the owners").

However, the placement of small surveyor's monuments beneath the surface of plaintiffs' property might—if plaintiffs' claims are timely and if placement of the monuments is attributable to defendant—support a claim that the government has taken the portion of plaintiffs' property physically occupied by the monuments. *See Loretto v. Teleprompter Manhattan CATV Corp.* (*Loretto* ), 458 U.S. 419, 434–35, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982) (stating that, in cases of permanent physical occupation of property, "our cases uniformly have found a taking to the extent of the occupation, without regard to whether the action achieves an important public benefit or has only minimal economic impact on the owner"); *Hendler v. United States*, 952 F.2d 1364, 1375–77 (Fed.Cir.1991) (finding that the placement of wells on the plaintiffs' property to monitor the movement of contaminated ground water effected a taking through physical occupation). Because of the ambiguity of plaintiffs' briefing, the court is unable to conclude, as defendant does, *see* Def.'s Resp. 5, that plaintiffs are not attempting to assert such a claim.

This case was filed recently, and defendant has not yet filed an answer. Discovery has not begun. This is plaintiffs' first motion to amend their Complaint. The court therefore concludes that there is no "reason—such as

undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, [or] undue prejudice to the opposing party by virtue of allowance of the amendment," *Foman*, 371 U.S. at 182, 83 S.Ct. 227, to deny plaintiffs leave to amend their Complaint to assert a claim regarding the portion of their property occupied by the surveyor's monuments. Of course, the court does not consider or determine here whether such a pleading would state a claim upon which relief could be granted.

The court therefore finds that reconsideration is warranted only insofar as plaintiffs seek to assert a taking of the small portion of their property occupied by the surveyor's monuments.

2. Notwithstanding the Potential Severability of the First Phase of the Project, Plaintiffs Fail to State a Physical Takings Claim for Flooding upon Which Relief Can Be Granted

■■■ Plaintiffs contend that reconsideration is appropriate because the court has misinterpreted their allegation that the Prado Dam project is complete. Pls.' Mot. 16 (citing *Villanueva v. United States*, 662 F.3d 124, 128 (1st Cir.2011)). Plaintiffs contend that "the court misapprehended the facts by failing to grant deference to the facts alleged in the complaint that the 'phase one' Prado Dam project was a complete and severable project from the rest of the Santa Ana River Mainstem Project (phases two and three)." *Id.* at 15 (capitalization omitted). Plaintiffs state that "[p]hases two and three of the Santa Ana Project had nothing to do with the Prado Dam project," *id.* at 17, and that, by stating otherwise, "Defendant [has led] this Court down the proverbial 'primrose path,'" *id.* at 19. Plaintiffs argue that "this factual misapprehension as to the completion of the Prado Dam project has caused the court to misplace emphasis on flooding cases like [*Sponenbarger* ] and [*Danforth* ]." *Id.* (capitalization omitted).

Defendant responds that a 2009 press release published by the Corps and relied upon by plaintiffs in their Complaint and briefing states that the second phase (the construc-

tion of retention dikes) and the third phase (raising the Prado Dam spillway by twenty feet) of the modernization of the Prado Dam have not yet been completed.[7] Def.'s Resp. 6. Defendant further contends that, even if the Prado Dam portion of the Project were complete, "completion of a flood control project capable of flooding private property is not a condition sufficient to establish a taking; actual flooding of the private property is required." Id. at 7.

Whether the phases of the Project involving the Prado Dam are finished is immaterial to the viability of plaintiffs' claims. "A reduction or increase in the value of property may occur by reason of ... the beginning or completion of a project. Such changes in value are incidents of ownership. They cannot be considered as a 'taking' in the constitutional sense." Danforth, 308 U.S. at 285, 60 S.Ct. 231. Therefore, plaintiffs' contention that the court misinterpreted their allegation that the portion of the Project involving the Prado Dam has been completed is not an appropriate basis for reconsideration. The potential severability of this portion of the Project does not change the court's determination that the government has not effected a physical taking.

3. Plaintiffs' New Argument That the Government Has Effected a Hybrid, De Facto or Constructive Taking or Has Cast a Cloud on Their Title Is Untimely for Purposes of Reconsideration

■ In their Motion, plaintiffs raise the new contention that the records of survey and surveyor's monuments "establish[ ] that a 'constructive' or 'de facto' taking of a flowage easement on the property and a 'cloud' on plaintiffs' title was created, constituting a physical title tak[ing] of plaintiffs' property

rights."[8] Pls.' Mot. 22 (capitalization omitted). Plaintiffs describe several cases—not cited for this proposition in plaintiffs' Response—in which courts addressed whether government actions had effected hybrid, de facto or constructive takings. Id. at 26–27. Plaintiffs do not discuss a hybrid taking theory in their motion. However, because plaintiffs cite the case that first applied the hybrid taking analysis, the court will construe plaintiffs' new contentions to include a hybrid taking theory. See Pls.' Mot. 26 (citing Drakes Bay Land Co. v. United States (Drakes Bay ), 191 Ct.Cl. 389, 424 F.2d 574 (1970)). Plaintiffs contend that in each of these cases courts acknowledged that, when the government has announced its intent to condemn property but has delayed excessively in condemning the property, "government actions above and beyond mere announcement of intent to condemn" may effect a taking. Id. at 27.

Plaintiffs contend that the government's actions have effected such a taking because

> Plaintiffs here have not suffered a mere 'announcement' of condemnation. Over the years there has also been the (1) recorded Records of Survey; (2) physical placement of monuments on Plaintiffs' Property delineating the 566 foot flood inundation line; (3) circulation of a map of reservation of the flood inundation line arising by reason of the final completion of the Prado Dam; (4) negotiations to acquire the Property; (5) the purchase of all of the surrounding properties; and (6) delay in the acquisition of the Property for 23 years, all of which, when taken together, constitute a 'de facto' taking and cast[ ] a cloud on the Plaintiffs' title.

Id. at 24.[9]

"[A]n argument made for the first time in a motion for reconsideration comes too late,

7. Defendant correctly notes that the court could have relied upon this document without converting defendant's motion to dismiss into a motion for summary judgment. Mem. of the U.S. in Resp. to Pls.' Mot. for Recons., Dkt. No. 18, at 6 n.3 (citing, inter alia, In re Syntex Corp. Sec. Litig., 95 F.3d 922, 926 (9th Cir.1996); Love Terminal Partners v. United States, 97 Fed.Cl. 355, 385 (2011)).

8. The court discusses these doctrines in greater detail below. See infra Parts III.B.3.a-c.

9. The claims asserted by plaintiffs relate to the alleged taking of a flowage easement over the portion of their property between the 556–foot flood inundation line and the 566–foot flood inundation line, not to any taking of the small portion of plaintiffs' property occupied by the surveyor's monuments. See supra Part III.A.1.

and is ordinarily deemed waived." *Bluebonnet*, 466 F.3d at 1361. Plaintiffs did not argue in their Response that the government's actions had effected a de facto taking or a constructive taking, or that the government's actions cast a cloud on their title.[10] The terms "hybrid taking," "de facto taking" and "constructive taking" do not appear in plaintiffs' Response.[11]

Further, plaintiffs do not explain why they could not have raised this argument in their Response. As plaintiffs characterize the doctrine they now urge the court to apply, "government actions above and beyond mere announcement of intent to condemn may constitute a de facto or constructive taking, where there is excessive delay." Pls.' Mot. 27. When plaintiffs filed their Response, they were aware, *see* Pls.' Resp. 2, 4–8, of at least four of the six government actions they now describe as "constitut[ing] a 'de facto' taking and ... a cloud on the Plaintiffs' title," *see* Pls.' Mot. 24. Plaintiffs do not contend that in the absence of the "new" evidence, these four government actions are insufficient to support a finding of a hybrid, de facto or constructive taking, or creation of a cloud on title. Because plaintiffs have not persuaded the court that they were unable to raise their new argument based upon the evidence previously in their possession, plaintiffs have failed to demonstrate the type of "extraordinary circumstances," *Fru–Con,*

44 Fed.Cl. at 300, that justify reconsideration.

**B. Justice Requires that Plaintiffs be Permitted to Amend Their Complaint Only to Assert a Claim for the Taking of the Property Occupied by the Surveyor's Monuments**

The Federal Circuit has not addressed the proper standard to apply when a plaintiff seeks leave to amend its complaint after judgment has been entered. *See supra* Part II.D. However, plaintiffs have satisfied the requirements of the standards applied in other circuits only with regard to their new claim that the government has effected a taking of the land occupied by the surveyor's monuments. Plaintiffs' other arguments for reconsideration do not meet the requirements for reconsideration under RCFC 59. *See supra* Part III.A. And, for the reasons set out below, *see infra* Parts III.B.1–3, plaintiffs' other proposed amendments do not meet the more lenient standards applicable to amendment of complaints under RCFC 15 because they are futile.

**1. Plaintiffs' Proposed Amendments**

In the alternative to their request that the court reconsider its opinion, plaintiffs request that the court permit them to amend their Complaint in three ways. First, plaintiffs

---

**10.** Although plaintiffs appear to suggest otherwise, *see* Pls.' RCFC 59(a)(1)(A)–(B) Mot. for Recons. of (1) July 3, 2012 J. and (2) July 2, 2012 Op. and Order Directing Entry of J. Granting Def.'s RCFC 12(b)(6) Mot. to Dismiss the Compl. (plaintiffs' Motion or Pls.' Mot.), Dkt. No. 16, at 27 n.8 ("This Court failed to consider the fact that these delay cases would constitute a taking ...."), the court does not view the section of plaintiffs' Response in which they contended that governmental delay is relevant to various types of Fifth Amendment due process and takings claims as raising the argument plaintiffs now present, *compare* Pls.' Resp. 30 ("Finding a taking ... will deter the government, as in the present case, where the government has delayed over an unreasonable period of time, in condemning the flowage easement ...."), *with* Pls.' Mot. 27 (arguing that governmental delay constitutes a "de facto or constructive taking"). Plaintiffs are correct that governmental delay may be relevant to several types of takings analysis. *See, e.g., Tahoe–Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency,* 535 U.S. 302, 342, 122 S.Ct. 1465,

152 L.Ed.2d 517 (2002) ("[T]he duration of the restriction is one of the important factors that a court must consider in the appraisal of a regulatory takings claim...."). However, plaintiffs did not, by this observation, apply the "de facto or constructive taking" analysis they now contend is appropriate. *See* Pls.' Mot. 27.

**11.** The only reference in plaintiffs' Response to the creation of a cloud on title by government action appears in a large block quotation from *Hurley v. Kincaid (Hurley)*, 285 U.S. 95, 52 S.Ct. 267, 76 L.Ed. 637 (1932), in which the Supreme Court summarized the *Hurley* plaintiff's allegations. *See* Pls.' Resp. 14–15. Plaintiffs' statement in their Response that the plaintiff in *Hurley* alleged a cloud on his title, *see id.,* is not an argument that the government has, in this case, created a cloud on their title. Furthermore, for the reasons described below, *see infra* Part III.B.3.a, *Hurley* does not support plaintiffs' new contention that the government's actions have created a cloud on their title that is compensable as a taking.

request leave to amend their Complaint to address the "new" evidence—the records of survey and surveyor's monuments—and to clarify that the first phase of the Project is severable from the second and third phases. *See* Pls.' Mot. 15, 18–19, 22. Plaintiffs believe that their proposed amendments support their argument that the government has effected a physical taking. *See id.*

■ Second, plaintiffs request leave to amend their Complaint "to assert a takings claim based directly on the U.S. creation of a cloud on title on Plaintiffs' Property," *id.* at 25; *see also id.* at 27–28 (stating same), which plaintiffs also characterize as a "constructive or de facto tak[ing]," *id.* at 22; *see id.* at 31. The "de facto taking" or "constructive taking" doctrines apply when the government—usually in the context of urban renewal projects—directly and substantially interferes with property rights by inequitable precondemnation conduct. *See infra* Part III.B.3.c. Based on the *Drakes Bay* case that plaintiffs cite, the court understands plaintiffs to be asserting also a taking under the related doctrine of "hybrid takings." *See* Pls.' Mot. 26; *infra* Part III.B.3.b.

Plaintiffs summarize the actions that plaintiffs believe effected a taking by creation of a cloud on plaintiffs' title to their property:

> Plaintiffs here have not suffered a mere "announcement" of condemnation. Over the years there has also been the (1) recorded Records of Survey; (2) physical placement of monuments on Plaintiffs' Property delineating the 566 foot flood inundation line; (3) circulation of a map of reservation of the flood inundation line arising by reason of the final completion of the Prado Dam; (4) negotiations to acquire the Property; (5) the purchase of all of the surrounding properties; and (6) delay in the acquisition of the Property for 23 years, all of which, when taken together, constitute a "de facto" taking....

*Id.* at 24. Although the doctrines invoked by plaintiffs share similarities, the court discusses each separately in Parts III.B.3.a–c below because each deals with a different type of government action.

Third, plaintiffs request leave "to amend their complaint ... to assert a takings claim

based directly on the basis of the U.S., in this case, forcing the Plaintiffs to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Id.* at 30.

2. With the Exception of Plaintiffs' Proposed Amendments to Claim a Taking of the Land Occupied by the Surveyor's Monuments, Plaintiffs' Proposed Amendments to Their Complaint Are Futile

The placement of surveyor's monuments on plaintiffs' property may support a claim that the government has taken the small portion of their land occupied by the monuments. *See supra* Part III.A.1. The court will permit plaintiffs to amend their Complaint to assert such a claim. *See infra* Part IV.

However, the amendments plaintiffs seek to make to their Complaint regarding the severability of the first phase of the Project and newly discovered evidence do not change the court's conclusion that defendant has not effected a physical taking of a flowage easement. The court has determined that whether the phases of the Project involving the Prado Dam have been completed is irrelevant to the viability of plaintiffs' physical taking argument. *See supra* Part III.A.2. Further, the "new" evidence discovered by plaintiffs supports only an "apprehension of future flooding," which does not establish a physical taking of a flowage easement. *Supra* Part III.A.1. Therefore, amending plaintiffs' Complaint to allege the severability of the first phase of the Project and the new evidence would not change the court's determination that plaintiffs have failed to state a claim upon which relief can be granted.

Plaintiffs may amend their Complaint to assert a taking of the portion of their property occupied by the surveyor's monuments. However, because plaintiffs' proposed amendments in support of their claim for the physical taking of a flowage easement would be futile, justice does not require that plaintiffs be granted leave to make them. *See* RCFC 15(a)(2); *Foman,* 371 U.S. at 182, 83 S.Ct. 227.

3. Plaintiffs' Proposed Amendments Asserting New Legal Theories Would Be Futile

a. The Creation of a Cloud on Plaintiffs' Title

██ According to plaintiffs, "[t]he *Hurley* Court predicated the liability of the U.S. on a Fifth Amendment taking, premised on the casting of a cloud on title on the landowner[']s property." Pls.' Mot. 23 (emphasis omitted) (citing *Hurley,* 285 U.S. at 100, 52 S.Ct. 267). Plaintiffs believe that defendant's actions have cast a similar cloud on their title, constituting a taking. *Id.* at 22.

Plaintiffs misinterpret *Hurley.* As the court has explained, the Supreme Court in *Hurley* addressed a narrow question: whether or not an injunction was available to a landowner who alleged that the planned construction of a flood prevention project would subject his property to flooding. *MTD Op.,* 105 Fed.Cl. at 766–67. The Supreme Court determined that the *Hurley* landowner was not entitled to an injunction because "the complainant has a plain, adequate, and complete remedy at law": just compensation recovered pursuant to the Tucker Act once the taking had occurred. *Hurley,* 285 U.S. at 104–05, 52 S.Ct. 267. The Court explicitly confined its analysis to the type of remedy available to the landowner. *See id.* at 103, 52 S.Ct. 267 (stating that the court had "no occasion to determine any of the controverted issues of fact or any of the propositions of substantive law which have been argued"). In undertaking this analysis, the Court "assum[ed]" that, as alleged, the government's actions had effected or would effect a taking. *See id.* at 103–04, 52 S.Ct. 267. The court did not state that the government's actions had, in fact, created a cloud on the landowner's title in a manner that effected a taking.

Plaintiffs cite *Hurley* for the proposition that an apprehension of flooding creates a "cloud on title" constituting a taking. *See* Pls.' Mot. 23. However, plaintiffs fail to realize that the Supreme Court was merely summarizing the allegations of the *Hurley* plaintiff in the portion of the opinion that they cite, which included the allegation, similar to their own, that "the mere 'setting apart (of) this property as a flood way and diver-sion channel and ... advertising for and receiving bids for ... construction of the guide levees' casts a cloud upon his title," *id.* at 100, 52 S.Ct. 267 (omissions in original). Therefore, plaintiffs' reliance on *Hurley* for the proposition that an apprehension of flooding creates a "cloud on title" that effects a taking is entirely misplaced. Amendment of plaintiffs' Complaint to assert such a theory would be futile.

b. Hybrid Takings

██ In their Motion, plaintiffs quote *Drakes Bay,* apparently for the proposition that the government has effected a taking of the type found in the *Drakes Bay* case. *See* Pls.' Mot. 26.

In *Drakes Bay,* the plaintiff owned land on the Point Reyes peninsula in California that it had purchased to subdivide and sell in smaller parcels. *Drakes Bay,* 191 Ct.Cl. at 393–94, 424 F.2d at 576. After the plaintiff's purchase of the property, the federal government enacted the Point Reyes National Seashore Act, which authorized the creation of the Point Reyes National Seashore (the Seashore). *Id.* at 391, 424 F.2d at 575. The plaintiff's property was within the proposed boundaries of the Seashore, *id.,* but the legislation, as interpreted by the court, provided that instead of the United States' title to the land vesting immediately, the United States "acquired an inchoate interest at once, to be perfected later," *id.* at 407–08, 424 F.2d at 584. The court found it "clear from the language of the Point Reyes National Seashore Act ..., as set in the context of its legislative history, that Congress enacted it requiring and expecting that an equitable acquisition program would be effected with reasonable promptness." *Id.* at 404, 424 F.2d at 582 (internal quotation marks omitted).

The National Park Service (the Park Service) "viewed subdividers as the primary threat to the [Seashore]" and initially represented that it would acquire the *Drakes Bay* plaintiff's land. *Id.* at 409–10, 424 F.2d at 585–86. However, the Park Service was able to prevent development of the plaintiff's land without acquiring it. Park Service employ-

ees attended public hearings to protest the plaintiff's subdivision plan and the extension of water service to the subdivision. *Id.* at 397–99, 424 F.2d at 578–79. The Park Service purchased a neighboring property, the Heims ranch, which provided the only feasible access to the plaintiff's property. *Id.* at 400–04, 424 F.2d at 580–82. Then, the Park Service, perceiving that the "plaintiff's hopes for subdivision were dashed" by the government's purchase of the Heims ranch, withdrew its offer to purchase the *Drakes Bay* plaintiff's property. *Id.* at 409–11, 424 F.2d at 585–86. The plaintiff attempted to sell his property to other purchasers but was unsuccessful. *Id.* at 411, 424 F.2d at 586.

The United States Court of Claims (Court of Claims) concluded that the Park Service had effected a hybrid taking, explaining its holding as follows:

> In the later Redwood National Park Act, title to the entire designated area vested immediately, just compensation being left for subsequent settlement. Here the Congress took steps in that direction, but did not go all the way. It contemplated that title would normally vest, not on enactment of the law, but on later acquisition by purchase, condemnation, or exchange. But it would seem, and we hold, from the language and legislative history, that it acquired an inchoate interest at once, to be perfected later. Important legal consequences follow when, as here, the Congress flatly declares that it is going to acquire land.... Congress must also be deemed presumptively aware that the activities of its agents implementing its programs can effect takings without recourse to the usual machinery of land acquisition, that is, purchase or condemnation.... We think that the activities of officials can be found to be takings much more readily when there is no official question whether the land is to be acquired, only when, and the activities involved are all directed to that ultimate end. This is a hybrid situation, not the pure legislative taking, as in the Redwoods Act, and not the pure physical invasion of land apparently unwanted as Government property, as in *Eyherabide*. The Congress was well aware of the economic harm that would result to persons who intended subdivision and others, if the inchoate taking were left unperfected. It authorized officials to employ promptly certain unusual steps to keep this from happening, notably exchanges, and contracts in excess of appropriations available for obligation. If officials ignore these means placed in their hands, but take other positive and effectual steps to prevent such exploitation, we think that a taking has occurred.

*Id.* at 407–08, 424 F.2d at 584 (internal citations omitted). The court declined to determine the exact date of the taking, but stated that "a better date than any other is that of the refusal by defendant to purchase that followed its success in thwarting the subdivision by acquiring the Heims ranch which lay across the only feasible access." *Id.* at 414, 424 F.2d at 587–88. The court noted that "[i]t was then that defendant effectively used its available funds to thwart plaintiff, not to compensate it." *Id.* at 414, 424 F.2d at 588.

However, the Court of Claims' subsequent decisions indicate that the outcome in *Drakes Bay* was premised on "a special combination of circumstances," *Hilkovsky v. United States*, 205 Ct.Cl. 460, 464, 504 F.2d 1112, 1113 (1974), that does not exist here. The facts alleged by plaintiffs in this case more closely resemble those of *Mesa Ranch Partnership v. United States* (*Mesa Ranch*), 222 Ct.Cl. 623, 650 F.2d 285 (1980).[12] In *Mesa Ranch*, the plaintiff owned land on the coast of the Pacific Ocean in Marin, California.

---

12. *Mesa Ranch Partnership* (*Mesa Ranch*), 222 Ct.Cl. 623 (1980), an order deciding a motion to dismiss, appears in the *Federal Reporter* in a table of "Decisions by Order Without Published Opinions," *see* 650 F.2d 285 (1980), and is erroneously described as an unpublished opinion on www.westlaw.com, *see* No. 279–79C, 1980 WL 99761 (Ct.Cl. Feb.8, 1980). However, the order is published in *Court of Claims Reports* at 222 Ct.Cl. 623. *Court of Claims Reports* was the official reporter of the United States Court of Claims, *see Commodities Recovery Corp. v. United States*, 34 Fed.Cl. 282, 292 n. 9 (1995), and the order in *Mesa Ranch* is therefore a published decision, *see id.*; *Daniels v. United States*, 77 Fed.Cl. 251, 255 n. 4 (2007), *aff'd*, 269 Fed.Appx. 976 (Fed.Cir. 2008) (per curiam) (unpublished). The order is correctly reported on www.lexis.com. *See Mesa Ranch*, 222 Ct.Cl. 623, No. 279–79C, 1980 U.S.Ct. Cl. LEXIS 40 (Ct.Cl. Feb. 8, 1980).

*Mesa Ranch,* 222 Ct.Cl. at 624, 650 F.2d 285. The *Mesa Ranch* plaintiff alleged that personnel of the Department of the Interior and a congressman, with the goal of adding the plaintiff's land to either the Point Reyes National Seashore or the Golden Gate National Recreation area, "exerted pressure on Marin County and instigated a plan or scheme by the county to prevent or delay petitioner in developing the property, as it desired to do." *Id.* The county "was persuaded to 'downzone' the property to reduce the lot yield from 1,000 to 10 units, thereby depressing the market value of the tract so that defendant could acquire it more cheaply." *Id.* Congress then adopted a revised map of the Seashore that included the plaintiff's property within its boundaries. *Id.* The government "informed plaintiff that it would acquire the tract at some undetermined future date when funds were available." *Id.* at 625, 650 F.2d 285. The plaintiff claimed that the land had become unmarketable. *Id.* Defendant filed a motion to dismiss, which the court granted. *Id.* at 626, 650 F.2d 285.

The *Mesa Ranch* court concluded that "[t]he placement of the tract o[n] the map not being enough, and the acts of the Marin County zoning board not being imputable to the United States, ... plaintiff does not allege anything else which justifies us in holding defendant has taken the land before following the procedure Congress intended to be used." *Id.* The court in *Mesa Ranch* therefore distinguished the plaintiff's allegations from the facts of *Drakes Bay,* based on its finding that "[t]he publication of the map was an 'inchoate taking' of lands shown by the map to have been selected, with the taking remaining to be perfected by further official action." *Id.* at 625, 650 F.2d 285. Such an "inchoate taking" by "mere inclusion of the land in the map is not a taking." *Id.*

The court further explained that its conclusion in *Drakes Bay* that a taking had occurred was not premised on the inclusion of the plaintiff's property within a statutory map of the Seashore (which did not itself effect a taking) or the acts of local officials to thwart development (which, the court had since held, could not be imputed to the government[13]). *Id.* at 625–26, 650 F.2d 285. Instead, the court found "[o]utstanding among" the government's actions in *Drakes Bay* "that defendant there, while refusing to deal with that plaintiff, expended such funds as it had to obtain tracts that would wholly obstruct access from the plaintiff's proposed subdivision to the highway." *Id.* at 626, 650 F.2d 285. The key difference, then, between *Drakes Bay* and *Mesa Ranch* is that in *Drakes Bay,* the government's action in obstructing access to plaintiff's land was sufficient to support a takings claim, but in *Mesa Ranch,* there was only "the possibility that future events, or nonevents, ... might ripen into a taking." *Id.* The court further noted that "threats of condemnation by United States officials are not takings even though they tend to thwart proposed developments." *Id.* (describing the holding of *NBH Land Co. v. United States* (*NBH Land*), 217 Ct.Cl. 41, 576 F.2d 317 (1978)).

In this case, as in *Mesa Ranch,* plaintiffs have alleged only "the possibility that future events ... might ripen into a taking." *Compare supra* Part III.A.1, *with Mesa Ranch,* 222 Ct.Cl. at 626, 650 F.2d 285. Plaintiffs have alleged nothing that justifies the conclusion that the government has taken a flowage easement over their property pursuant to *Drakes Bay.* Cf. *Drakes Bay,* 191 Ct.Cl. at 408, 424 F.2d at 584 (finding that the Park Service's "positive and effectual steps to prevent" the plaintiff from developing his property effectuated a taking). Although plaintiffs allege that the Orange County Governmental Entities have acquired several properties "neighboring and encircling Plaintiffs' Property," Compl. ¶ 28, plaintiffs do not allege that these acquisitions—even if they are attributable to the government[14]—restricted or eliminated ac-

---

**13.** In *Drakes Bay,* the court did not consider the extent to which the actions of state and local officials could be imputed to the government. *Drakes Bay Land Co. v. United States,* 191 Ct.Cl. 389, 408–09, 424 F.2d 574, 585 (1970).

**14.** Plaintiffs allege that the government "act[ed] in concert" with Orange County, the Orange County Flood Control District and the Board of Supervisors of Orange County (the Orange County Governmental Entities), Compl. ¶ 4, but does not allege that the Orange County Governmental

cess to their property or in any way perfected an inchoate taking, *id. passim.* As in *Mesa Ranch,* none of plaintiffs' allegations is sufficient to support a takings claim. Specifically, the distribution of flood plain maps on which a portion of plaintiffs' property is shown as lying below the 566–foot flood inundation line, *see MTD Op.,* 105 Fed.Cl. at 762–63, does not effect a taking, *see Mesa Ranch,* 222 Ct.Cl. at 625, 650 F.2d 285; *Hilkovsky,* 205 Ct.Cl. at 464, 504 F.2d at 1113. Statements by the government and others—in the records of survey and on the surveyor's monuments, *see supra* Part III.A.1, and in a letter approving plaintiffs' construction proposal, *see MTD Op.,* 105 Fed.Cl. at 762–63—acknowledging that easements extending to the higher, 566–foot flood inundation line might be acquired in the future, even if construed as threats by the government to condemn a flowage easement, do not effect a taking, *see Kirby Forest Indus. v. United States,* 467 U.S. 1, 14–16, 104 S.Ct. 2187, 81 L.Ed.2d 1 (1984) (finding that the filing of a notice of lis pendens publicizing the beginning of condemnation proceedings did not effect a taking); *Mesa Ranch,* 222 Ct.Cl. at 626, 650 F.2d 285 (stating that threats to condemn property do not effect a taking); *NBH Land,* 217 Ct.Cl. at 43–44, 576 F.2d at 319 (stating that threats to condemn do not effect a taking, as distinguished from the "use and exploitation of local zoning along with other acts and omissions," a "combination" that constituted a taking in *Drakes Bay* ).

█ Plaintiffs argue that a twenty-three-year delay in the acquisition of easements over their property supports their contention that the government must have effected a taking. *See* Pls.' Mot. 24. However, delay in acquiring easements does not effect a hybrid taking of the type found in *Drakes Bay. See Hilkovsky,* 205 Ct.Cl. at 467, 504 F.2d at 1115 ("Plaintiffs' only complaint of Government taking is the length of time that the

Government has been buying, trading for, or condemning theirs and others' lands within the boundaries of the National Seashore, but that is not enough."). Nor do failed negotiations to purchase a property result in a hybrid taking. *Ferrari v. United States,* 73 Fed.Cl. 219, 225 (2006).

To the extent that plaintiffs allege that zoning changes with respect to their property constitute a taking, *see* Compl. ¶¶ 23–26, the decision by the city of Chino to zone the portion of plaintiffs' property below 566 feet in elevation for passive recreational and open space use cannot be imputed to the government, regardless of whether the city did so to maintain the eligibility of other properties in the city for federal flood insurance, *see B & G Enters., Ltd. v. United States,* 220 F.3d 1318, 1323–24 (Fed.Cir.2000) (stating that "the federal government's conditioning a state or locality's receipt of federal funds on the state's taking a particular action does not make that state or locality an agent of the federal government" for purposes of takings analysis (citing, inter alia, *Griggs v. Allegheny Cnty.,* 369 U.S. 84, 89, 82 S.Ct. 531, 7 L.Ed.2d 585 (1962))); *Mesa Ranch,* 222 Ct. Cl. at 626, 650 F.2d 285 ("Since the *Drakes Bay* case we have squarely held that acts of federal officials in persuading local officials to obstruct development by placing new burdens upon it, or refusing to lift old ones, are not takings imputable to the United States."); *cf. Hendler,* 952 F.2d at 1378–79 (finding the actions of state employees attributable to the government where they entered the plaintiff's property pursuant to authority granted by federal statute and a federal administrative order).

Because plaintiffs allege government actions of the type that other courts have determined do not effect a hybrid taking as described in *Drakes Bay,* the court concludes that allowing plaintiffs to amend their complaint to assert a *Drakes Bay* hybrid taking would be futile. Therefore, justice does not

Entities, in their efforts acquire the land and easements necessary for the Project, acted as agents of the government, *cf. id.* (stating that the Orange County Governmental Entities and the government acted as "independent contractual agents"); *id.* ¶ 16 (quoting the following portion of the agreement between the government and

the Orange County Governmental Entities: " 'The parties to this Agreement shall act in an independent capacity in the performance of their respective functions under this Agreement, and no party is to be considered the officer, agent, or employee of the other.' ").

require that plaintiffs be permitted to amend their Complaint to allege a hybrid taking pursuant to *Drakes Bay. See* RCFC 15(a)(2); *Foman,* 371 U.S. at 182, 83 S.Ct. 227.

### c. Inequitable Precondemnation Conduct: Constructive and De Facto Takings

■ Plaintiffs argue that "government actions above and beyond mere announcement of intent to condemn may constitute a de facto or constructive taking where there is excessive delay." Pls.' Mot. 27. The constructive or de facto takings doctrine bears a resemblance to the hybrid taking theory set out by the Court of Claims in *Drakes Bay* (in fact, courts applying it often cite *Drakes Bay* ) but developed largely in other circuits to address inequitable precondemnation conduct by government entities in the context of urban renewal. *See, e.g., Richmond Elks Hall Ass'n v. Richmond Redev. Agency* (*Richmond Elks* ), 561 F.2d 1327, at 1329–30 (9th Cir.1977) (citing, inter alia, *Drakes Bay,* 424 F.2d at 584). According to plaintiffs, "[t]o establish such a cause of action, there must be a direct and substantial interference with property rights caused by extraordinarily delayed condemnation proceedings or other unreasonable conduct on the part of the condemning authority." Pls.' Mot. 26–27 (emphasis omitted).

■ Plaintiffs misstate the standard that courts apply to alleged de facto or constructive takings. As the United States Court of Appeals for the Ninth Circuit explained in a case against a city redevelopment agency, "When a public entity acting in furtherance of a public project directly and substantially interferes with property rights and thereby significantly impairs the value of the property, the result is a taking." *Richmond Elks,* 561 F.2d at 1330. In *Richmond Elks,* the city redevelopment agency adopted a timetable requiring it to purchase the plaintiff's property within two years, demolished nearby properties, making it nearly impossible for the plaintiff to obtain insurance or loans, informed the plaintiff and its tenants that they would not be entitled to compensation for any new improvements made to the property (leading most of the plaintiff's tenants to leave) and, in the course of street improve-

ments, repeatedly flooded the plaintiff's basement and sealed off a portion of the basement. *Id.* at 1329–30. The redevelopment agency then informed the plaintiff that it would not purchase the property. *Id.* at 1330. The Ninth Circuit concluded that the redevelopment agency's actions had deprived the plaintiff of its rights, recognized under California law, "to use, sell, lease, and encumber [its] real property." *Id.* at 1330–31.

Plaintiffs' reliance on the urban renewal cases is misplaced because plaintiffs do not allege government actions that have "directly and substantially interfere[d]," *Richmond Elks,* 561 F.2d at 1330, with their property rights, as the courts found with respect to the government's actions in the urban renewal cases in which courts found a de facto or constructive taking, *see, e.g., Benenson v. United States,* 212 Ct.Cl. 375, 388–89, 548 F.2d 939, 947 (1977) ("For many years, both the plaintiffs and the officials of the Government have recognized that it is not economically feasible to restore and operate the existing building as a hotel or other business property, but the defendant has barred the plaintiffs from demolishing the property and using the site for other purposes."); *Thomas W. Garland, Inc. v. City of St. Louis,* 596 F.2d 784, 786 (8th Cir.1979) (finding that the plaintiff had stated a valid cause of action for a taking where it alleged that the city's contractor had ordered the plaintiff to abandon its property and had then undertaken demolition nearby with a "headache ball," damaging the plaintiff's building and creating debris that blocked the plaintiff's loading dock, clogged its air conditioning system and covered its merchandise in dust); *Foster v. City of Detroit,* 254 F.Supp. 655, 659–60, 665–66 (E.D.Mich.1966), *aff'd,* 405 F.2d 138 (6th Cir. 1968) (finding a taking where the government, among other things, abandoned condemnation proceedings it had allowed to continue for ten years, during which time it refused to grant construction permits unless the plaintiff agreed to waive its right to any additional value created by the improvements and—when the plaintiff's buildings became unsafe—ordered that the plaintiff demolish them); *cf. Kaiser Dev. Co. v. City & Cnty. of Honolulu,* 913 F.2d 573, 575 (9th Cir.1990) (stating that claims for inequitable precon-

demnation conduct are regulatory takings claims and that, accordingly, a plaintiff must show that the government entity has " 'denied [him] economically viable use of his land.' " (quoting *Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825, 834, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987)) (brackets in original omitted)). Plaintiffs do not allege similarly direct and substantial interference with their property rights.[15] *See supra* Part III.B.3.b (describing the actions that plaintiffs allege to be attributable to defendant). Therefore, plaintiffs have not alleged sufficient facts to support a de facto or constructive takings claim. *Cf. Richmond Elks*, 561 F.2d at 1330.

Because allowing plaintiffs to amend their Complaint to allege a de facto or constructive taking would be futile, justice does not require that the court permit plaintiffs to do so. *See* RCFC 15(a)(2); *Foman*, 371 U.S. at 182, 83 S.Ct. 227.

### d. Fairness and Justice

■■■ Plaintiffs request leave "to amend their complaint . . . to assert a takings claim based directly on the basis of the U.S., in this case, forcing the Plaintiffs to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." Pls.' Mot. 30. Plaintiffs appear to suggest that both the Supreme Court and the United States Court of Federal Claims have recognized the validity of a "fairness and justice claim" that can be asserted without reference to accepted methods of takings analysis. *See id.* at 28–29. Quoting portions of two cases without context, plaintiffs contend that dismissal of such a fairness and justice claim at the pleadings stage is improper because "a

trial court's review of taking[s] complaints may disclose unique allegations, and in turn, unique findings." *Id.* at 29–30 (citing *Alley's of Kingsport, Inc. v. United States (Alley's of Kingsport )*, 103 Fed.Cl. 449, 454 (2012); *120 Del. Ave., LLC v. United States*, 95 Fed.Cl. 627, 632 (2010)).

Defendant responds that "it is not for the Court to invent new theories of relief for Plaintiffs, who must state a plausible claim for relief within the boundaries of controlling law." Def.'s Resp. 7. Defendant notes that "the *Alley's of Kingsport* decision Plaintiffs invoke turned in part upon the Court's conclusion that no existing 'takings' theory . . . resembles the legal and factual theories offered,' and '[c]ounsel have advised us of none.' " *Id.* (quoting *Alley's of Kingsport*, 103 Fed.Cl. at 453). Defendant further notes that "[i]n that context, and because the plaintiff's regulatory economic takings theory would require the Court to engage in 'ad hoc' factual analysis, the court permitted the case to proceed to discovery." *Id.* Defendant argues that "[h]ere, Plaintiffs have insisted that their 'single cause of action and claim for relief' purports to allege a 'physical' 'flowage easement' taking—not a 'regulatory economic tak[ing].' " *Id.* (alteration in original) (quoting Pls.' Resp. 1, 4, 13). Therefore, "[t]here is no 'ad hoc' factual analysis to conduct, and Plaintiffs' claims are squarely foreclosed by clearly established and controlling rules that govern physical takings." *Id.* at 8.

Defendant further argues that the cases cited by plaintiffs do not "support the idea that a plaintiff can bring a generalized claim to be compensated for alleged government 'unfairness.' " *Id.* Defendant contends that

---

**15.** Plaintiffs cite *R.J. Widen Co. v. United States (R.J. Widen )*, 174 Ct.Cl. 1020, 357 F.2d 988 (1966), *see* Pls.' Mot. 24, but do not allege actions by defendant similar to the government's actions in that case. In *R.J. Widen*, the court found that a taking had occurred and noted, citing flooding cases, that "to constitute a taking under the Fifth Amendment it is not necessary that property be absolutely 'taken' in the narrow sense . . .; it is sufficient if the action by the government involves a direct interference with or disturbance of property rights." *R.J. Widen*, 174 Ct.Cl. at 1027, 357 F.2d at 993. In *R.J. Widen*, however, the government's contractor had "entered upon plaintiff's property without its permission, cut trees, bulldozed the land, removed soil, used the land as a dumping ground, and destroyed plaintiff's dam and headgates." *Id.* at 1023, 357 F.2d at 990. The actions of the government's contractor cut off the water supply to the plaintiff's tannery. *Id.* In this case, the placement on plaintiffs' property of surveyor's monuments that "were buried and hidden at the time they were set, as much as 2–feet below the surface, making it impossible for the Plaintiffs to visually or otherwise discover them," and of which plaintiffs were "completely unaware," Pls.' Mot. 14–15, is not a comparable "direct interference," *R.J. Widen*, 174 Ct.Cl. at 1027, 357 F.2d at 993, with plaintiffs' rights in the portion of plaintiffs' property below 566 feet in elevation.

"Plaintiffs' essential complaint remains that it has taken the United States too long to purchase from Plaintiffs the additional portion of their property that may be flooded in the event that the United States, in the future, releases water that inundates the Prado Dam Flood Basin to [the] furthest extent of its new design limits." *Id.*

Defendant is correct that plaintiffs may not assert "a generalized claim to be compensated for alleged government 'unfairness.' " *Id.* In asserting such a claim, plaintiffs appear to be paraphrasing the Supreme Court's statement in *Armstrong v. United States,* 364 U.S. 40, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960), that the purpose of the Takings Clause is "to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong,* 364 U.S. at 49, 80 S.Ct. 1563. Courts often repeat or refer to this statement of purpose when developing and applying the standards that determine whether a taking has occurred. *See, e.g., Tahoe–Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency,* 535 U.S. 302, 332, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002) ("[W]e will consider whether the interest in protecting individual property owners from bearing public burdens 'which, in all fairness and justice, should be borne by the public as a whole,' justifies creating a new rule for these circumstances." (internal citation omitted) (quoting *Armstrong,* 364 U.S. at 49, 80 S.Ct. 1563)); *Palazzolo v. Rhode Island,* 533 U.S. 606, 617–18, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001) (stating that the Court's determination of whether a regulatory taking had occurred would be "informed by the purpose of the Takings Clause, which is to prevent the government from 'forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole' " (quoting *Armstrong,* 364 U.S. at 49, 80 S.Ct. 1563)).

In the cases cited by plaintiffs, courts allowed cases to proceed to discovery because it was not clear that the plaintiffs' unique allegations were governed by any existing standard. *See Alley's of Kingsport,* 103 Fed. Cl. at 453–54 (stating that the plaintiffs "present unusual allegations that nevertheless create the prima facie feel of a takings case warranting just compensation" and that the "[p]laintiffs may discover evidence pretrial that helps to develop a previously unknown taking theory of the type the Supreme Court urged us to consider ad hoc" (internal quotation marks omitted)); *120 Del. Ave., LLC,* 95 Fed.Cl. at 632 ("The issue presented here, which appears to be one of first impression, is whether it is plausible that this type of governmental action could constitute a compensable taking.").

Plaintiffs contend that their case *"may* turn out to be unique." Pls.' Mot. 30 (original emphasis omitted and new emphasis added). However, courts have examined allegations similar to those made by plaintiffs and determined—in decisions binding on this court—that they do not amount to a taking. *See MTD Op.,* 105 Fed.Cl. at 765–68 (stating that the apprehension of future flooding does not effect a taking); *supra* Part III.B.3.a (stating that plaintiffs' reliance on *Hurley* for the proposition that the apprehension of future flooding creates a cloud on their title is misplaced); *supra* Part III.B.3.b (stating that the flood plain maps, placement of small surveyor's monuments, the acts of local officials, failed negotiations to purchase plaintiffs' property, statements that the government may acquire easements in the future and delay in acquiring easements do not effect a hybrid taking under *Drakes Bay* ); *supra* Part III.B.3.c (finding that the government's actions did not directly and substantially interfere with plaintiffs' property rights in the manner found to be a de facto or constructive taking in the inequitable precondemnation conduct cases). Plaintiffs do not distinguish the facts of these cases from the allegations in their Complaint or Amended Complaint. The court is therefore not at liberty to develop a new standard to determine whether the government's actions have forced plaintiffs "alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *See Armstrong,* 364 U.S. at 49, 80 S.Ct. 1563

Because granting plaintiffs leave to amend their Complaint to allege a "fairness and justice claim" would be futile, justice does not require that the court permit plaintiffs to do

so. *See* RCFC 15(a)(2); *Foman,* 371 U.S. at 182, 83 S.Ct. 227.

IV. Conclusion

For the foregoing reasons, plaintiffs have, in the main, failed to meet the standards applicable to requests for reconsideration and to motions for leave to amend a complaint. Plaintiffs' request for reconsideration is largely premised on untimely arguments and proffers evidence that, although alleged to be newly discovered, does not change the court's conclusion that no physical taking of a flowage easement has occurred. Plaintiffs' proposed amendments to their Complaint would be futile insofar as plaintiffs seek to assert that the government has effected a flowage easement.

However, reconsideration is appropriate to the extent that plaintiffs seek to assert a claim for a taking of the small portion of their property alleged to be occupied by the surveyor's monuments. When a landowner asserts that government action has resulted in the permanent physical invasion of property, a taking may be found "without regard to whether the action . . . has only minimal economic impact on the owner." *Loretto,* 458 U.S. at 434–35, 102 S.Ct. 3164. Because it is not clear whether plaintiffs seek to assert such a claim, *see supra* Part III.A.1, the court will afford plaintiffs an opportunity to amend their Complaint to plead a claim for a physical taking of the portion of plaintiffs' property alleged to be occupied by the surveyor's monuments. With the exception of the foregoing grant of permission to amend their Complaint, plaintiffs' Motion is DENIED.

If plaintiffs choose to pursue a claim that the government has taken the portion of their property occupied by the surveyor's monuments, plaintiffs SHALL FILE an amendment to their Complaint at or before 5:00 p.m. Eastern Standard Time on Friday, November 16, 2012.

IT IS SO ORDERED.