# United States Court of Appeals for the Federal Circuit

———————————

**STUEVE BROS. FARMS, LLC, AND MILL CREEK FARMING ASSOCIATES, INC.,**
*Plaintiffs-Appellants,*

**v.**

**UNITED STATES,**
*Defendant-Appellee.*

———————————

2013-5021

———————————

Appeal from the United States Court of Federal Claims in No. 11-CV-0799, Chief Judge Emily C. Hewitt.

———————————

Decided: December 11, 2013

———————————

ROBERT H. FREILICH, Freilich & Popowitz LLP, of Los Angeles, California, argued for plaintiffs-appellants. With him on the brief was NEIL M. POPOWITZ.

JOSHUA P. WILSON, Attorney, Natural Resources Section, Environment and Natural Resources Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee. With him on the brief were IGNACIA S. MORENO, Assistant Attorney General, and ROBERT H. OAKLEY, Attorney, Appellate Section.

———————————

Before PROST, BRYSON, and REYNA, *Circuit Judges.*

BRYSON, *Circuit Judge.*

This takings case requires us to decide whether the government's actions effected a physical taking of a flowage easement over the plaintiffs' property, even though the government never occupied the property by flooding. The Court of Federal Claims held that the government's conduct did not constitute a taking. We affirm.

I

In 1941, the United States Army Corps of Engineers completed construction of the Prado Dam on the Santa Ana River near Corona, California. Predecessors of plaintiffs Stueve Bros. Farms, LLC, and Millcreek Farming Associates, LLC, subsequently purchased property located in the Prado Dam flood control basin. At the time of the construction, the Corps of Engineers anticipated that releases of water impounded by the dam could inundate some of the property in the flood control basin, including portions of the plaintiffs' property up to a certain elevation. Accordingly, the government took a flowage easement over the property to an elevation of 556 feet above sea level and paid compensation to the plaintiffs for the easement.

In the 1970s, the Corps of Engineers developed plans to modify the Prado Dam to improve flood protection for the area surrounding the dam. The plans included several projects, among which were projects to raise the height of the dam, to increase the size of the dam spillway, and to enlarge the dam reservoir. It was expected that those projects would raise the maximum flood inundation line by ten feet, from 556 feet to 566 feet above sea level.

Pursuant to a 1989 agreement between the Corps of Engineers and the flood control districts of several California counties, local governmental agencies undertook to

acquire or condemn property and easements as needed for the project.  Between 1993 and 2008, local governmental agencies acquired a number of parcels in the vicinity of the plaintiffs' property.  In 1999, the Orange County Flood Control District offered to purchase the plaintiffs' property.  The plaintiffs declined the District's offer and made a counteroffer, which the District did not accept.  No further purchase negotiations took place after that time.  Neither the Corps of Engineers nor the local authorities have since obtained title or a flowage easement to the portion of the plaintiffs' property between the 556-foot line and the 566-foot line.

Following the Corps of Engineers' announcement of its intention to raise the maximum flood inundation line to 566 feet, the local governmental agencies recorded a survey that delineated the 566-foot flood inundation line.  In addition, according to the plaintiffs' allegations, the local governmental agencies and the Corps of Engineers arranged for six small brass surveyor's markers to be placed on the plaintiffs' property to mark the 566-foot line.  The plaintiffs contend that they did not discover the markers until July 2012.

In 2003, the Corps of Engineers issued flood-plain maps showing the 566-foot flood inundation line.  The City of Chino, California, subsequently rezoned the portion of the plaintiffs' property below the 566-foot line for "passive recreation and open space use."

The construction work that raised the level of the Prado Dam was completed in 2008; work continued, however, on other parts of the project, including the work to increase the size of the Prado Dam spillway.  There has not been any flooding above the prior 556-foot maximum flooding line either before or after the completion of the project to raise the level of the dam.  In fact the property has never flooded to any depth as a result of Prado Dam activities.

In 2011, the plaintiffs brought this action in the Court of Federal Claims, contending that the various actions of the federal government, viewed in conjunction, constituted a taking of a flowage easement over the portion of the plaintiffs' property between the 556-foot and 566-foot flood inundation lines. The government moved to dismiss the complaint for failure to state a claim on which relief could be granted. The Court of Federal Claims granted the motion and dismissed the complaint in a thorough opinion on which we substantially rely. *Stueve Bros. Farms, LLC v. United States*, 105 Fed. Cl. 760 (2012).

Based mainly on the Supreme Court's decisions in *Danforth v. United States*, 308 U.S. 271 (1939), and *United States v. Sponenbarger*, 308 U.S. 256 (1939), the Court of Federal Claims held that in the absence of any actual flooding of their property, the plaintiffs could not sustain their claim that the government has taken a flowage easement over the portion of their property between the 556-foot and 566-foot flood inundation lines. The court explained that the government's "acknowledgement that the Project may subject plaintiffs' property to future flooding and [its] suggestion that the government may acquire additional flowage easements support, at most, an apprehension of future flooding. They do not support a finding that the government has already taken a flowage easement across plaintiffs' property." *Stueve Bros. Farms,* 105 Fed. Cl. at 767.

Following the dismissal order, the plaintiffs filed a motion for reconsideration and a motion to amend their complaint. The plaintiffs argued that they had recently discovered that in 1991 and 1993 the government had conducted and recorded surveys that delineated the 566-foot flood inundation line. They also claimed they had only recently learned of the placement of small brass markers at that line. They argued that those new facts supported their takings claim. In addition, they made further arguments in support of their contention that the

government's conduct constituted a taking even in the absence of actual flooding.

The Court of Federal Claims denied the motion to reconsider on the ground that the additional arguments raised in the motion could have been raised in the original proceeding. The court granted the motion to amend the complaint in part and denied it in part. It denied the motion to amend with respect to the claim that the government had engaged in a de facto taking, on the ground that the de facto taking allegations were legally futile. The court granted the motion to amend with respect to the plaintiffs' allegations regarding the placement of the six small surveyor's markers on their land. As to those allegations, the court held that the plaintiffs would be allowed to seek compensation for the physical taking of the property actually appropriated by the markers. *Stueve Bros. Farms, LLC v. United States*, 107 Fed. Cl. 469, 479 (2012). The plaintiffs declined to press that claim, however, and took this appeal.

## II

The plaintiffs' principal argument is that the totality of the actions of the Corps of Engineers constitutes a physical taking of a flowage easement over their property, even though the Prado Dam project has never resulted in flooding of any of the property. Actual flooding is not necessary to effect a taking in this case, the plaintiffs argue, because the alleged acts of the federal government, either alone or in conjunction with local governmental authorities, cumulatively had the effect of a taking.[1]

---

[1] The plaintiffs do not contend that the facts in this case gave rise to a regulatory taking; they rely entirely on their claim that the government's conduct constituted a physical taking.

A

The main problem with the plaintiffs' position, as the Court of Federal Claims explained, is that under well-settled law the apprehension of flooding does not constitute a taking of a flowage easement. The Supreme Court made that point clear in *Danforth v. United States*, 308 U.S. 271 (1939), and *United States v. Sponenbarger*, 308 U.S. 256 (1939).

The Court in *Danforth* was addressing a question about the proper calculation of interest on a condemnation award. The award was for a flowage easement over land that was taken and converted into a floodway as part of a flood control project. In order to calculate the interest, it was important for the Court to determine when the taking occurred. The landowner argued that the taking occurred at the time of the enactment of the statute that authorized the creation of the floodway. The landowner's theory was that the passage of the act immediately diminished the value of the property that was to be used as a floodway.

The Supreme Court rejected that argument, holding that a reduction of the value of property "may occur by reason of legislation for or the beginning or completion of a project. Such changes in value are incidents of ownership. They cannot be considered as a 'taking' in the constitutional sense." 308 U.S. at 285. Therefore, the Court held, the "mere enactment of legislation which authorizes condemnation of property cannot be a taking." *Id.* at 286. *See also Kirby Forest Indus., Inc. v. United States*, 467 U.S. 1, 15 (1984) ("[I]mpairment of the market value of real property incident to otherwise legitimate government action ordinarily does not result in a taking. . . . At least in the absence of an interference with an owner's legal right to dispose of his land, even a substantial reduction of the attractiveness of the property to

potential purchasers does not entitle the owner to compensation under the Fifth Amendment.").

Turning to the question whether there was a taking when work on the flood control project began or when the project was completed, the Court explained that the construction of the project would constitute a taking only if the construction "would put upon this land a burden, actually experienced, of caring for floods greater than it bore prior to the construction." *Danforth*, 308 U.S. at 286. In the absence of actual flooding resulting in such a burden on the land, the Court held that the government was not liable for a taking.

In *Sponenbarger*, decided the same day as *Danforth*, the floodway landowner argued that a taking occurred when the authorizing statute went into effect and work began on the flood control project that resulted in the creation of the floodway. Again, the Supreme Court rejected the landowner's argument, pointing out that "the Government has not interfered with [the landowner's] possession and as yet has caused no flooding of her land." *Sponenbarger*, 308 U.S. at 267. The Court added that the landowner's contention "amounts to no more than the claim that [her] land was taken when the statutory plan gave rise to an apprehension of future flooding," an event that "might never occur for many reasons." *Id.*

The plaintiffs seek to distinguish *Danforth* as standing for the proposition that a flood control flowage easement cannot be taken if the flood control legislation is repealed or the flood control project is never commenced. In fact, however, the project at issue in *Danforth* was substantially complete, and the question before the Court was whether the completion of the project effected a taking of the landowner's property. In that situation, and in the absence of a direct appropriation, the Court ruled that the government would be liable for a taking only if the project resulted in flooding "actually experienced" that

was greater than the flooding experienced before the project. *Danforth*, 308 U.S. at 286. The plaintiffs' distinction is unpersuasive.

*Sponenbarger* is inapposite, the plaintiffs argue, because the flood control project that would have impacted the land in dispute in that case was abandoned. But the relevant portion of the opinion in *Sponenbarger* assumes that it could be shown that the flood control project would cause increased flooding in the future. Even in that setting, the Court concluded, there would be no taking, but merely an uncompensable "apprehension of future flooding." *Sponenbarger*, 308 U.S. at 267. As relevant to this case, both *Danforth* and *Sponenbarger* stand for the proposition that the possibility of future flooding does not effect a physical taking of a flowage easement in the absence of actual flooding.

The plaintiffs rely heavily on the Supreme Court's earlier decision in *Hurley v. Kincaid*, 285 U.S. 95 (1932). They assert that in that case the Court found liability for the taking of a flowage easement as the result of a flood control system "without the necessity of flooding." But that is not what the Court did. Instead, the Court merely "assume[d]" that the landowner was correct in charging that Congress's adoption of a plan of flood control that could impact the landowner's property constituted a taking "as soon as the government begins to carry out the project authorized." *Id.* at 103-04. Even accepting that assumption, the Court held, the landowner would have a full remedy at law and therefore was not entitled to equitable relief to enjoin the project. *Id.* at 104-05. Thus, the Court in *Hurley* did not decide that the facts of that case gave rise to a taking. If there were any doubt on that score, it was put to rest in *Sponenbarger*. There, after stating that there was no merit to the theory that a taking occurred in that case absent flooding, the Court explained that "[w]hether recovery at law could be had

upon a similar contention was left open by *Hurley v. Kincaid*." 308 U.S. at 268 n.16.[2]

Our predecessor court, the Court of Claims, followed *Danforth* and *Sponenbarger* in a case quite similar to this one. In *Poinsett Lumber & Manufacturing Co. v. United States*, 91 Ct. Cl. 264 (1940), Congress enacted legislation authorizing the construction of levees in the area of the Poinsett Company's property. The Poinsett Company alleged that various acts by the government constituted a taking: the authorization and appropriation of funds for the levees; the construction of a dam and levees upstream of the Poinsett Company's property; and the planned construction of levees that, when completed, could result in flooding of the Poinsett Company's land.

The court sustained the government's demurrer, pointing out that there had as yet been no flooding of the Poinsett property and that the construction had not interfered with Poinsett's use or occupation of its land. In order to make out a physical taking, the court explained, "it must definitely appear that there has been an actual physical invasion or encroachment upon private property by the government, or else such a direct physical destruction or deprivation of use as to permanently dispossess the owner and oust him of the beneficial use and enjoyment thereof." *Poinsett,* 91 Ct. Cl. at 266. The court added that "the mere adoption of the plan is not the equivalent of a taking. The acts of the Government must constitute an actual invasion and dispossession of the use and occupancy of the property by the owners." *Id.* at 267.

---

[2]    The plaintiffs also rely on the Supreme Court's recent decision in *Arkansas Game & Fish Comm'n v. United States*, 133 S. Ct. 511 (2012), but that case merely held that a temporary period of flooding can give rise to a temporary physical taking. It said nothing about whether a physical taking by flooding requires actual flooding.

B

The plaintiffs contend that, even if the authorization and initiation of the new construction on the dam did not effect a taking, the totality of the events relating to the identification of the 566-foot flood inundation line had that effect. In particular, the plaintiffs allege that the government expressed an intention to take a future flowage easement over the property, authorized the condemnation of the land below the 566-foot line, recorded a survey of the portion of the land below that line, prepared maps showing the 566-foot line, placed small brass markers on the property to identify that line, abandoned negotiations for the purchase of the plaintiffs' property despite approving the purchase of other properties below the 566-foot line, and delayed the planned acquisition of the plaintiffs' property for more than 20 years.

Contrary to the plaintiffs' contentions, none of those actions, viewed individually or collectively, constituted a taking of a flowage easement over the plaintiffs' property. The Court of Claims repeatedly held that the expression of an intention to condemn property, i.e., a "threat of condemnation," does not effect a taking. *NBH Land Co. v. United States*, 576 F.2d 317, 319 (Ct. Cl. 1978); *see also Lynch v. United States*, 221 Ct. Cl. 979, 981-82 (1979); *Grasso v. United States*, 218 Ct. Cl. 717, 721-22 (1978); *Hempstead Warehouse Corp. v. United States*, 98 F. Supp. 572, 573 (Ct. Cl. 1951) (citing cases). The fact that Congress authorized the acquisition of the property, either by purchase or condemnation, also does not in itself constitute a taking. *See Danforth*, 308 U.S. at 284-85. Nor does the inclusion of a landowner's property in a survey or map of properties that are expected to be acquired by the government constitute a taking. *Mesa Ranch P'ship v. United States*, 222 Ct. Cl. 623, 625 (1980); *Hilkovsky v. United States*, 504 F.2d 1112, 1113 (Ct. Cl. 1974) (mere description of the intended National Seashore in a statute did not effect a taking by itself).

## C

The plaintiffs attach great significance to the placement on their property of the six small brass markers that identify the 566-foot flood inundation line. The trial court recognized that the placement of the markers could constitute a physical taking of the portion of the property on which the markers were placed, and the court offered the plaintiffs an opportunity to plead that takings theory. They declined, however, no doubt recognizing that the recovery for the appropriation of a few square inches of their property would be de minimis. However, they now make two arguments that are based on the placement of the markers. First, they contend that the placement of the markers was a further indication of the settled intention of the government to take a flowage easement over their property up to the 566-foot line. Second, they argue that the placement of the markers established that the government has effected a physical taking and that in calculating the damages for that physical taking, the court must look to the amount of compensation that would have been paid had the federal government or the local governmental entities taken a flowage easement over the property by eminent domain.

Neither theory stands up. The placement of the markers adds nothing to the evidence that the government has identified the 566-foot line as the line of maximum flooding following the construction raising the height of the Prado Dam. The 566-foot line had been announced in advance of the placement of the survey markers, and it was acknowledged to be the line of maximum flooding before the plaintiffs raised the issue of the survey markers for the first time in their motions for reconsideration and to amend the complaint.

As for the plaintiffs' argument that the damages for the physical taking resulting from the placement of the markers should be the condemnation value of the flowage

easement, there is no logical basis for that claim. The physical taking that the Court of Federal Claims identified as potentially eligible for recovery was the taking of the small amount of property occupied by the markers. The plaintiffs offer no satisfactory explanation of why that minor intrusion on a few very small segments of the property should give rise to a judgment equal to the value of a flowage easement between the 556-foot and 566-foot flood inundation lines. While the plaintiffs argue that the markers demonstrate that this case involves a physical taking and is therefore unlike other cases in which the courts have declined to award compensation, they ignore that the award for the taking must be commensurate with what was taken. In this case, government conduct other than the placement of the markers did not effect the taking of a flowage easement, and the small physical taking resulting from the placement of the markers did not convert the government's conduct into the taking of a flowage easement. The plaintiffs are therefore not entitled to damages commensurate with the damages that would arise from the taking of a flowage easement.

D

The plaintiffs next assert that in a series of analogous situations the courts have found physical takings without a showing of an actual physical invasion. The cases on which the plaintiffs rely, however, are not analogous to this case.

The plaintiffs first invoke cases involving the taking of water from property owners with riparian rights. In those cases, such as *Dugan v. Rank*, 372 U.S. 609 (1963); *Casitas Municipal Water District*, 543 F.3d 1276 (Fed. Cir. 2008); and *Gerlach Livestock Co. v. United States*, 76 F. Supp. 87 (Ct. Cl. 1948), *aff'd*, 339 U.S. 725 (1950), the government action in question cut off or diverted water from the landowners' property. The landowners sued, contending that their ownership rights to the water had

been taken. That scenario has nothing to do with the one before this court, as the taking of water to which the landowners are entitled is clearly a physical invasion that is effective as soon as the water is taken. The Court of Claims in *Gerlach* remarked that the taking of riparian rights begins "whenever the defendant's intent to take has been definitely asserted and it begins to carry out that intent." 76 F. Supp. at 97. In this case, unlike in the riparian rights cases, the government has not flooded the plaintiffs' property and thus has not begun to carry out the physical invasion that constitutes the taking.

The plaintiffs next point to cases involving the "rails-to-trails" legislation in which Congress legislatively sought to convert abandoned railroad easements into public trails, even when, under state law, those abandoned easements would revert to adjacent landowners. In *Presault v. United States*, 100 F.3d 1525 (Fed. Cir. 1996) (en banc), this court held that the legislative elimination of adjacent landowners' reversionary interests in the abandoned rail easements led to a compensable taking, as the legislation authorized the government to deprive the landowners of their exclusive possessory rights in the abandoned easements. By contrast, the conduct of the Corps of Engineers in this case has not interfered with any of the plaintiffs' rights as to the use or disposition of their property.

The same distinction applies to the plaintiffs' citation of cases involving the extension of a navigational servitude onto private property, *see Kaiser Aetna v. United States*, 444 U.S. 164 (1979), and the required dedication of easements to the public, *see Dolan v. City of Tigard*, 512 U.S. 374 (1994). By limiting the landowners' right to exclude others, as was done in those cases, the government deprived the landowners of a core attribute of property ownership. In this case, no such right of property ownership has been taken.

The plaintiffs next assert that the Supreme Court cases involving the firing of artillery over private property support finding a taking in this case. The two cited cases, *Peabody v. United States*, 231 U.S. 530 (1913), and *Portsmouth Harbor Land & Hotel Co. v. United States*, 260 U.S. 327 (1922), do not aid the plaintiffs. Instead, they provide support for the government's position. In *Peabody*, the Supreme Court held that the landowners' apprehension that the government would fire artillery from a battery near the landowners' property, combined with a loss of value in the property attributed to the proximity of the battery, did not constitute a taking because the guns had not been fired for several years. A taking cannot be found, the Court explained "unless there has been an actual appropriation of property . . . . Land, or an interest in land, cannot be deemed to be taken by the Government merely because it is suitable to be used in connection with an adjoining tract which the Government has acquired, or because of a depreciation in its value due to the apprehension of such use." *Peabody*, 231 U.S. at 539. That principle supports the holding of the Court of Federal Claims in this case, that government conduct falling short of a physical invasion of the plaintiffs' property cannot be a physical taking even if the government's conduct results in a reduction of the value of that property.

In *Portsmouth Harbor*, a later case involving the same property, the Court found that the plaintiffs had made a sufficient showing to overcome the government's demurrer. Significantly, however, the Court did not find that a taking could be shown merely because the government had installed new guns at the battery site. The Court instead required that shots be fired across the landowners' property in order for a taking to be found. The Court explained that "a single act may not be enough, [but] a continuance of them in sufficient number and for a sufficient time may prove it." *Portsmouth Harbor*, 260 U.S. at 329-30.

E

The plaintiffs point out that it has been more than 20 years since the Prado Dam enlargement project began, and they argue that the government's failure to acquire a flowage easement during that period by itself gives rise to a compensable taking. The government's delay in acquiring property, even when it ultimately intends to acquire the property, is normally not enough to constitute a taking. *Hilkovsky v. United States,* 504 F.2d 1112, 1115 (Ct. Cl. 1974). The plaintiffs rely on cases that have held that governmental delays in property acquisition accompanied by severe restrictions on the property owner's use of their property during the period of delay can amount to a taking or a due process violation. *See Benenson v. United States*, 548 F.2d 939 (Ct. Cl. 1977) (acts of government pending acquisition of hotel prevented owners from selling the property or using it for any income-producing purpose); *Urbanizadora Versalles, Inc. v. Rivera Rios*, 701 F.2d 993 (1st Cir. 1983) (14-year government enforced moratorium on development of a property pending condemnation).

In this case, however, neither the Corps of Engineers nor any other federal entity prohibited the plaintiffs from using their property as they chose. The only restraints on their right to use their property were imposed by local governmental entities, including the City of Chino, which zoned the portion of the property at issue in this case for recreational and open space use. The plaintiffs argue that the City took that step only because property in the city would otherwise have been ineligible for federal flood insurance. But that motivation for the City's promulgation of its zoning restrictions cannot help the plaintiffs. The actions of state and local officials in voluntarily implementing zoning restrictions that affect the landowner's property do not become takings by the federal government just because the local officials act in cooperation with, or at the urging of, federal officials. *Mesa Ranch*

*P'ship*, 222 Ct. Cl. at 626 ("[W]e have squarely held that acts of federal officials in persuading local officials to obstruct development by placing new burdens upon it, or refusing to lift old ones, are not takings imputable to the United States."); *Lynch v. United States*, 221 Ct. Cl. 979, 981-82 (1979); *Nalder v. United States*, 217 Ct. Cl. 686, 687 (1978); *De-Tom Enters., Inc. v. United States*, 552 F.2d 337, 339 (Ct. Cl. 1977); *cf. B&G Enters., Ltd. v. United States*, 220 F.3d 1318, 1325 (Fed. Cir. 2000).[3]

F

The plaintiffs make a closely related claim under the rubric of a "de facto taking," which is generally defined as a taking that results either from physical invasion or the imposition of some restraint that substantially deprives the property owner of the use and enjoyment of its property. *See* 2A Julius L. Sackman, *Nichols on Eminent Domain* § 6.01[15] (3d ed. 2013); *City of Buffalo v. J.W. Clement Co.*, 269 N.E.2d 895, 902-03 (N.Y. 1971). They assert that the government's conduct, taken as a whole, interfered with their property rights to such an extent that it should have led the Court of Federal Claims to conclude that the government took their property without compensation, even in the absence of a formal condemnation or physical invasion (other than the placement of the six brass surveyor's markers).

The sum and substance of the various governmental actions of which the plaintiffs complain is that the Corps

---

[3]    We have been advised that the plaintiffs have brought a parallel action in California Superior Court, alleging a taking of the same property that is at issue in this case by the Orange County Flood Control District and other local governmental entities. *Stueve Bros. Farms, LLC v. Orange County Flood Control District*, No. CIV RS 1303346 (Cal. Super. Ct.).

of Engineers was authorized to acquire a flowage ease-
ment over the plaintiffs' property. But after negotiations
for the purchase of the property fell through, the Corps of
Engineers and the local governmental agencies failed to
acquire the property by eminent domain, while nonethe-
less continuing to treat the 566-foot line as the maximum
level of flooding that could result from operation of the
Prado Dam. The combination of the threat of flooding and
the city's zoning regulations, according to the plaintiffs,
largely destroyed the value of their property by depriving
them, or any potential purchaser, of the incentive or
ability to develop the property.

There are indeed cases in which the courts have found
de facto takings when the government has not actually
acquired or invaded the property owners' property. But in
each of those cases, the government had taken steps that
directly and substantially interfered with the owner's
property rights to the extent of rendering the property
unusable or valueless to the owner. *See Drakes Bay Land
Co. v. United States*, 424 F.2d 574 (Ct. Cl. 1970) (govern-
ment action denied access to landowner's property and
otherwise rendered it valueless); *Foster v. United States*,
607 F.2d 843 (Ct. Cl. 1979) (government denied owner of
mineral rights permission to extract minerals from prop-
erty); *Richmond Elks Hall Ass'n v. Richmond Redevelop-
ment Agency*, 561 F.2d 1327, 1330 (9th Cir. 1977) (because
of agency actions, property became unsaleable and "its
use for its intended purposes became severely limited");
*Foster v. City of Detroit*, 254 F. Supp. 655 (E.D. Mich.
1966), *aff'd*, 405 F.2d 138 (6th Cir. 1968) (city abandoned
condemnation proceedings after 10 years, inhibited prop-
erty owner from making improvements, and ultimately
ordered property owner to demolish buildings on the
property).

As the Court of Federal Claims explained, 107 Fed.
Cl. at 487-88, the plaintiffs' allegations in this case do not
approach matching the facts presented in those extreme

cases. There has been no invasion of their property by flooding or otherwise (setting aside the placement of the surveyor's markers). No federal statute, regulation, or other directive has limited the plaintiffs' rights with respect to their use of their property. Nor has any federal agency taken action that restricts access to or other use of the property. We therefore do not agree with the plaintiffs that the government's conduct in this case gave rise to a de facto taking for which the plaintiffs are owed compensation.[4]

The plaintiffs make the separate contention that the Court of Federal Claims erred by failing to apply principles of "fairness and justice" in this case. They base that claim on the Supreme Court's decision in *Armstrong v. United States*, 364 U.S. 40 (1960), where the Court stated that the Takings Clause is "designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Id.* at 49. That expression captures one of the principles underlying the Takings Clause, but it does not set forth a theory of recovery or define a cause of action. Because we have concluded that, under well-

---

[4] The plaintiffs argue in passing that the Court of Federal Claims erred in refusing to accept the reply brief in support of their motion for reconsideration that they submitted after the court entered an order setting a date for the filing of a reply brief. We need not decide whether the court erred in refusing to consider the reply brief because that brief would not have changed the court's reasoning. The reply brief did not address the question whether the issues raised on reconsideration could have been raised earlier, which was the ground upon which the court denied reconsideration. Moreover, the reply brief contains nothing that would have changed that court's (or our) analysis of the substantive legal issues in this case.

settled principles of takings law, the allegations regarding the federal government's actions do not give rise to a physical taking, we are constrained to hold that the plaintiffs have failed to state a claim upon which relief can be granted.

For the foregoing reasons, we conclude that the Court of Federal Claims correctly held that there was no physical taking of a flowage easement over the plaintiffs' property.

**AFFIRMED**