**131 Nev., Advance Opinion 41**

## IN THE SUPREME COURT OF THE STATE OF NEVADA

THE STATE OF NEVADA, ON RELATION OF ITS DEPARTMENT OF TRANSPORTATION, Petitioner, vs. THE EIGHTH JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA, IN AND FOR THE COUNTY OF CLARK; AND THE HONORABLE ALLAN R. EARL, DISTRICT JUDGE, Respondents, and AD AMERICA, INC., A NEVADA CORPORATION, Real Party in Interest.

No. 63179

**FILED**

JUN 25 2015



TRACIE K. LINDEMAN
CLERK OF SUPREME COURT
BY
CHIEF DEPUTY CLERK

Original petition for a writ of mandamus or prohibition challenging a district court partial summary judgment in an inverse condemnation proceeding.

*Petition granted.*

Paul

Adam Laxalt, Attorney General, and Dennis Gallagher, Chief Deputy Attorney General, Carson City; Lemons, Grundy & Eisenberg and Robert L. Eisenberg, Reno; Chapman Law Firm, P.C., and Michael G. Chapman and Erich N. Storm, Las Vegas,
for Petitioner.

Law Offices of Brian C. Padgett and Brian C. Padgett and John P. Shannon, Las Vegas; Leach Johnson Song & Gruchow and Kirby C. Gruchow, Jr., Las Vegas,
for Real Party in Interest.

11/6/15: Corrected per letter to publishers. CJ

15-19376

Law Offices of Kermitt L. Waters and Kermitt L. Waters, James Jack Leavitt, Michael A. Schneider, and Autumn L. Waters, Las Vegas, for Amici Curiae People's Initiative to Stop the Taking of Our Land and Carrie L. Jenkins.

---

BEFORE THE COURT EN BANC.

*OPINION*

By the Court, DOUGLAS, J.:

In this opinion, we consider whether the district court erred by determining that Nevada's Department of Transportation (NDOT) owes just compensation for taking Ad America's property in conjunction with Project Neon, a freeway improvement plan, based on NDOT's and the City of Las Vegas' precondemnation activities. Specifically, we address whether a taking occurred under either the United States or Nevada Constitutions because NDOT publicly disclosed its plan to acquire Ad America's property to comply with federal law, the City independently acquired property that was previously a part of Project Neon, and the City rendered land-use application decisions conditioned on coordination with NDOT for purposes of Project Neon. We conclude that the district court erred by conflating Nevada's precondemnation damages standard with takings law, and that, after applying the correct law, no taking of Ad America's property occurred. Accordingly, we grant the petition.

*FACTUAL AND PROCEDURAL HISTORY*

*Project Neon*

Petitioner NDOT is the lead agency for Project Neon, a six-phase, 20- to 25-year freeway improvement project for the Interstate Highway 15 (I-15) corridor between Sahara Avenue and the U.S. Route

95/I-15 interchange in Las Vegas. With an estimated cost of between $1.3 and $1.8 billion dollars, the completion of Project Neon depends primarily on funding from the Federal Highway Association (FHWA). To procure this funding, NDOT complied with the National Environmental Policy Act (NEPA) by performing an environmental assessment of Project Neon between 2003 and 2009. NEPA required NDOT to publicly release all reasonable development alternatives it was considering for public comment. Each of these alternatives included the commercial rental property owned by real party in interest, Ad America.

Based on the results of the environmental assessment, NEPA also required NDOT to complete an environmental impact statement (EIS). In 2011, after the approval of the EIS, FHWA allocated $203 million to NDOT for Phase 1 of Project Neon. Notably, at that time, NDOT did not anticipate acquiring Ad America's property for another 17 years during Phase 5, assuming funding was available.

To reduce the impacts associated with Project Neon, NDOT coordinated efforts with the City of Las Vegas and other agencies. Anticipating the development of an arterial improvement (the MLK Connector) that is no longer a part of Project Neon, the City amended its Master Plan to allow for certain road widening and, on October 24, 2007, purchased a tract of land from a private party. Additionally, the City approved 19 land-use applications for development rights of properties in proximity to Project Neon.[1]

---

[1]In several instances, the City conditioned its approval of land-use applications on coordination with NDOT. In all but one of these cases, the City removed those conditions. The City also tabled three land-use

*continued on next page . . .*

SUPREME COURT
OF
NEVADA

(O) 1947A

3

*Ad America*

Ad America acquired its property between 2004 and 2005, planning to redevelop existing business space into higher-end commercial offices with multilevel parking. To that end, Ad America hired a surveyor and architect, the latter having drafted a preliminary design. Ad America then retained a political consultant to obtain necessary development permits. After speaking with members of the City Planning Department and one City Council member, the consultant opined that there was a de facto moratorium on development in the path of Project Neon. Based on this opinion, Ad America chose not to submit development applications for its property.

In October 2007, Ad America began informing its tenants that its property would be acquired for Project Neon. Although Ad America's net rental income remained steady from 2007 to 2010, it decreased by approximately 37 percent in 2011.[2] Ad America has not had its property appraised or attempted to sell it. As of August 2012, Ad America could no longer meet its mortgage commitments.

---

*. . . continued*

applications because of concerns for aesthetics and potential conflicts with Project Neon, among other things.

[2]Ad America's tenant occupancy remained steady from 2007 to 2009, decreasing by approximately 36 percent (four tenants) in 2010. Ad America provided affidavits from two of its former tenants indicating that they did not renew their rental leases because of Project Neon. The record provides no data for net rental income or tenant occupancy for any period before 2007, making it impossible to assess any diminution of these values occurring between 2005 and 2007.

*Procedural history*

Ad America filed an inverse condemnation action against NDOT in the District Court of Clark County, Nevada, seeking precondemnation damages for alleged economic harm and just compensation for the alleged taking of its property.[3] Thereafter, NDOT filed a motion in the district court for a determination that the valuation date for purposes of the inverse condemnation action was May 3, 2011, the date Ad America served its summons and complaint. Ad America filed an opposition to that motion and included a countermotion to set a valuation date of October 24, 2007, the date it alleged that the acquisition of property for Project Neon began. NDOT interpreted Ad America's countermotion to include a motion for summary judgment on the takings issue and filed an opposition to Ad America's countermotion proposing the valuation date and a countermotion for summary judgment on the takings issue.

Ultimately, the district court granted Ad America's summary judgment requests and denied NDOT's summary judgment requests.[4] In its order, the district court attributed the City of Las Vegas' actions,

---

[3]The City of Las Vegas was listed as a party to the action but never served.

[4]Although the district court's order was somewhat opaque about its granting summary judgment in favor of Ad America on the takings issue, our review of the hearing transcripts confirms that this was the district court's intended disposition. *See Oxbow Constr. v. Eighth Judicial Dist. Court*, 130 Nev., Adv. Op. 86, 335 P.3d 1234, 1240 (2014) ("When a district court's order is unclear, its interpretation is a question of law that we review de novo.").

including its purchase of property and land-use decisions, to NDOT and determined that NDOT committed a taking of Ad America's property on October 24, 2007.[5] At the time of this decision, it was undisputed that NDOT had not physically occupied Ad America's property, passed any regulation or rule affecting Ad America's property, or taken any formal steps to commence eminent domain proceedings against Ad America's property. In its writ petition, NDOT requests that we order the district court to grant summary judgment and dismissal in NDOT's favor.

## DISCUSSION

*Writ consideration*

A writ of mandamus is available "to control an arbitrary or capricious exercise of discretion." *Int'l Game Tech., Inc. v. Second Judicial Dist. Court*, 124 Nev. 193, 197, 179 P.3d 556, 558 (2008). Generally, writ relief is available only when there is no "plain, speedy, and adequate remedy in the ordinary course of law." NRS 34.170; *Westpark Owners' Ass'n v. Eighth Judicial Dist. Court*, 123 Nev. 349, 356, 167 P.3d 421, 426 (2007). An appeal from a final judgment or order is usually an adequate remedy, *Int'l Game Tech.*, 124 Nev. at 197, 179 P.3d at 558, and the court often declines to exercise its discretion to consider writ petitions challenging interlocutory district court orders. *See Smith v. Eighth Judicial Dist. Court*, 113 Nev. 1343, 1344, 950 P.2d 280, 281 (1997). The court has considered writ petitions, however, when "an important issue of law needs clarification and considerations of sound judicial economy and

---

[5]We decline to address Ad America's precondemnation damages claim because the district court has not decided the issue.

administration militate in favor of granting the petition." *Int'l Game Tech.*, 124 Nev. at 197-98, 179 P.3d at 559.

We conclude that NDOT's writ petition merits our consideration. First, the petition raises an important issue regarding Nevada's takings law. Second, the petition presents an important question of policy about an agency's ability to engage in efficient, long-term planning dependent on federal funding. And third, given Project Neon's magnitude as a 20- to 25-year, six-phase freeway improvement project requiring multiple acquisitions of private property and the inevitability of other similar long-term projects in the future, addressing the issues raised in this petition will serve judicial economy. Accordingly, we exercise our discretion to consider this writ petition.[6]

We will only issue a writ of mandamus "to compel entry of a summary judgment when [the evidence on file viewed in a light most favorable to the nonmoving party shows] there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *Cnty. of Clark v. Bonanza No. 1*, 96 Nev. 643, 650, 615 P.2d 939, 943 (1980); *In re Irrevocable Trust Agreement of 1979*, 130 Nev., Adv. Op. 63, 331 P.3d 881, 889 n.8 (2014). In making this determination, we consider legal questions de novo. *In re Irrevocable Trust Agreement of 1979*, 130 Nev., Adv. Op. 63, 331 P.3d at 884-85.

_____

[6]We summarily deny Ad America's request for a writ of prohibition because it is not a proper vehicle to challenge the order at issue here. *Oxbow Constr.*, 130 Nev., Adv. Op. 86, 335 P.3d at 1238 n.4; *see also* NRS 34.320.

In its petition, NDOT argues that there was no taking here because there was no physical ouster, regulatory taking, or unlawful exaction. NDOT also contends that it cannot be held liable for the City's actions. According to NDOT, concluding that there has been a taking in these circumstances is unjustifiably speculative given the contingencies of both federal funding and continued need for Ad America's property in 2028 when Phase 5 of Project Neon begins.

In response, Ad America contends that NDOT committed a taking of its property.[7] Specifically, Ad America asserts that there was a de facto moratorium on development in Project Neon's path, Project Neon had moved from the planning to acquisition stage, and Ad America suffered substantial impacts. According to Ad America, it has been rendered an involuntary and indentured trustee of its property due to the effects of Project Neon.

*Takings*

Eight hundred years ago, the Magna Carta laid a foundation for individual property rights, including the protection of private property from unlawful government takings, which was incorporated into the U.S. Constitution.[8] *See* Bridget C.E. Dooling, *Take it Past the Limit:*

---

[7]Ad America frames its arguments in terms of a "de facto taking." However, the U.S. Supreme Court has not explicitly defined "de facto taking." Accordingly, to avoid confusion with other takings terminology, we do not use this term.

[8]Because Article 1, Section 8, Clause 6 of the Nevada Constitution was partially derived from its counterpart in the U.S. Constitution, *see Official Report of the Debates and Proceedings in the Constitutional Convention of the State of Nevada* 60-63 (July 4, 1864) (Eastman 1866), that clause, too, is connected to the Magna Carta.

Supreme Court
of
Nevada

(O) 1947A

*Regulatory Takings of Personal Property*, 16 Fed. Cir. B.J. 445, 454-55 (2007); Andrew S. Gold, *Regulatory Takings and Original Intent: The Direct, Physical Takings Thesis "Goes Too Far,"* 49 Am. U. L. Rev. 181, 208 (1999). Specifically, the Takings Clause in the Fifth Amendment of the U.S. Constitution provides that "private property [shall not] be taken for public use, without just compensation." Similarly, the Nevada Constitution provides that "[p]rivate property shall not be taken for public use without just compensation having been first made, or secured, except in cases of war, riot, fire, or great public peril, in which case compensation shall be afterward made." Nev. Const. art. 1, § 8, cl. 6. Our state constitution, however, also guarantees every individual's right to acquire, possess, and protect property. Nev. Const. art. 1, § 1. As we previously explained in *McCarran International Airport v. Sisolak*, 122 Nev. 645, 670, 137 P.3d 1110, 1127 (2006), "our State enjoys a rich history of protecting private property owners against government takings," and "the Nevada Constitution contemplates expansive property rights in the context of takings claims."

Although our federal and state constitutions provide significant protection of private property rights, these rights must be considered in light of the realities facing state and local government entities in their efforts to serve the public through long-term projects that require significant planning and extensive compliance with both state and federal law. Thus, these competing interests are balanced in takings jurisprudence. *See Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. ___, ___, 133 S. Ct. 2586, 2594-95 (2013) (explaining that there is a need to protect land-use permit applicants given their vulnerability in the face of government discretion granting or denying their application and a need to

protect the public from the burden of additional costs from the proposed development); *see also Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978) ("Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in general law . . . ." (internal quotation omitted)).

*Federal takings jurisprudence*

Given "the nearly infinite variety of ways in which government actions or regulations can affect property interests," no "magic formula" exists in every case for determining whether particular government interference constitutes a taking under the U.S. Constitution. *Arkansas Game & Fish Comm'n v. United States*, 568 U.S. ___, ___, 133 S. Ct. 511, 518 (2012). Nevertheless, there are several invariable rules applicable to specific circumstances. *Id.* "[A] direct government appropriation or physical invasion of private property," for example, is a taking, as is a government regulation that authorizes a permanent physical invasion of private property or "completely deprive[s] an owner of all economically beneficial use of her property." *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 537-38 (2005) (internal quotation omitted). A taking also occurs when a government entity requires an unlawful exaction in exchange for approval of a land-use permit. *See generally Koontz*, 570 U.S. ___, 133 S. Ct. 2586. Nearly all other takings claims "turn on situation-specific factual inquiries." *Arkansas Game*, 568 U.S. at ___, 133 S. Ct. at 518.

The parties agree that NDOT did not appropriate or physically invade Ad America's property. No unlawful exaction was possible because Ad America did not submit any land-use application. Moreover, the only government regulation identified by the parties—the City's amendment to

its General Plan—did not cause Ad America to suffer a permanent physical invasion of its property and, as evidenced by Ad America's stream of rental income and the continuing presence of commercial tenants, did not completely deprive Ad America of "all economically beneficial use" of its property. Accordingly, we are left to consider both regulatory and nonregulatory factual inquiries to decide whether actions attributable to NDOT amount to a taking.

*Regulatory analysis (Penn Central analysis)*

Generally, courts only consider ripe regulatory takings claims, and "a claim that the application of government regulations effects a taking of a property interest is not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue." *Williamson Ctny. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 186 (1985); *see also Hsu v. Cnty. of Clark*, 123 Nev. 625, 635, 173 P.3d 724, 732 (2007) (indicating that an owner need not exhaust her administrative remedies when a regulation authorizes a permanent physical invasion of her property). But when exhausting available remedies, including the filing of a land-use permit application, is futile, a matter is deemed ripe for review. *See Palazzolo v. Rhode Island*, 533 U.S. 606, 625-26 (2001); *see also State, Dep't of Taxation v. Scotsman Mfg. Co.*, 109 Nev. 252, 255, 849 P.2d 317, 319 (1993) (acknowledging that exhaustion of a taxpayer's administrative remedies is not required when doing so would be futile).

Applying the general exhaustion rule, Ad America's regulatory takings claim is unripe for review for a failure to file any land-use application with the City. And although Ad America contends that

exhaustion was futile because there was a de facto moratorium on developing property within Project Neon's path, the record does not support this contention. The opinion of Ad America's political consultant, which was based on alleged statements from only one of seven City Council members, is insufficient to establish the existence of such a moratorium. This is especially true given the context in which that opinion was provided, where the City had approved 19 land-use applications in proximity to Project Neon juxtaposed with having tabled a single entity's 3 applications for special-use permits.

Even if we ignored the requirement of administrative exhaustion, Ad America still could not establish that the City's amendment to its General Plan constituted a regulatory taking. Three factors guide ad hoc analyses of potential regulatory takings. *See Penn Cent.*, 438 U.S. at 124. These factors are (1) "the economic impact of the regulation on the claimant," (2) "the extent to which the regulation has interfered with distinct investment-backed expectations," and (3) "the character of the governmental action." *Id.* Here, the record does not support the proposition that the amendment had an economic impact on Ad America. Additionally, because the road-widening amendment had no demonstrated nexus to Ad America's property, any impact on Ad America's investment-backed expectations to develop its property would be negligible. Finally, given the need to widen specific streets to ensure adequate access to private property and construction areas during Project Neon, the character of the government action is more akin to "adjusting the benefits and burdens of economic life to promote the common good" than to a physical invasion. *Id.* We therefore conclude that the

regulation's impact on Ad America's property does not constitute a regulatory taking.

Nevertheless, even assuming that these factors favored a conclusion that Ad America's property was taken by the City's amendment to its Master Plan, NDOT was not directly or vicariously liable for the City's actions forming the basis of the hypothetical taking. There is no compensable taking in such circumstances "unless the government's actions on the intermediate third party have a direct and substantial impact on the plaintiff asserting the takings claim." *Tex. State Bank v. United States*, 423 F.3d 1370, 1377 (Fed. Cir. 2005) (internal quotation omitted). And despite Ad America's efforts to portray NDOT as a grand puppet master dictating the City's actions, the record does not support such a portrayal. A City's decision to amend its Master Plan in a coordinated effort to support both its residents' needs and the needs for a construction project that will benefit its residents does not satisfy the aforementioned legal standard.[9]

*Nonregulatory analysis*

As Ad America's briefing intimates and *Arkansas Game* acknowledges, *see* 568 U.S. at ___, 133 S. Ct. at 518, an ad hoc approach outside of the regulatory takings context is possible. The U.S. Court of Appeals for the Federal Circuit, for example, has recognized that even where no government regulation is at issue, a taking occurs if the government has "taken steps that directly and substantially interfere[ ]

---

[9]Based on the record, the City's unilateral decision to purchase a parcel of land for the MLK Connector also cannot be attributed to NDOT.

with [an] owner's property rights to the extent of rendering the property unusable or valueless to the owner." *Stueve Bros. Farms, LLC v. United States*, 737 F.3d 750, 759 (Fed. Cir. 2013). This standard, however, only applies in extreme cases. *Id.* As an example of an extreme case, we consider the facts of *Richmond Elks Hall Ass'n v. Richmond Redevelopment Agency*, 561 F.2d 1327 (9th Cir. 1977), wherein the Ninth Circuit concluded that a nonregulatory taking had occurred.

The Richmond Elks Hall Association (Elks) owned property that it leased to commercial tenants. *Richmond Elks*, 561 F.2d at 1329. In 1959, the City of Richmond declared that a group of properties, including Elks', was blighted, created the Richmond Development Agency (Agency), and authorized Agency to exercise eminent domain. *Id.* By May 1966, the City approved Agency's plan for redevelopment of the blighted area, which anticipated that Elks' property would be acquired within two years. *Id.* By the end of 1966, Agency had begun acquiring blighted properties. *Id.*

In early 1967, Elks received a letter from Agency stating that Elks could only retain its property if it signed an agreement to rehabilitate the property at its own expense, which Elks declined to do. *Id.* By May 1967, understanding that its property would soon be acquired, Elks refused to offer tenancies in excess of month-to-month. *Id.* Moreover, as a direct result of Agency's actions, Elks' commercial tenants suffered a decrease in their gross sales, causing most of the tenants to leave the property. *Id.* The exodus of tenants reduced Elks' rental income to less than one-third of what it was before Agency adopted its plan. *Id.* at 1329-30.

Supreme Court
of
Nevada

(O) 1947A

14

Later, in July 1968, Agency entered into an agreement with a developer obligating Agency to acquire optioned property, including that belonging to Elks, and then to convey it to the developer for construction of a shopping center. *Id.* at 1330. The option, aside from being publicly known, was extended from one year to two years. *Id.* By the end of 1969, after Agency had acquired 83 percent of the blighted properties, excluding Elks' property, federal funding was halted for the project. *Id.* Nearly three years later, despite Agency's redevelopment efforts flooding Elks' property on multiple occasions between 1970 and 1972 and its previous actions, Agency informed Elks that it would not acquire its property. *Id.* Based on these facts, the Ninth Circuit affirmed the lower court's determination that Agency's actions rendered Elks' property "unsaleable in the open market" and "severely limited" the property's use for its intended purposes. *Id.* at 1330-31.

The circumstances in this case do not approach the extremity of the facts in *Richmond Elks*. Unlike *Richmond Elks*, Ad America's property is not anticipated to be needed for Project Neon until 2028, if at all. At the date that Ad America alleges that a taking occurred, October 24, 2007, NDOT had not acquired a single parcel of property for Project Neon, and did not for another three years. And, even then, it acquired properties slotted for Phase 1 of the project, not Phase 5.

Also different from *Richmond Elks*, NDOT had not created a contractual obligation or option with a private party guaranteeing future rights to Ad America's property. Instead, the only meaningful action NDOT had taken as of the alleged date of taking was continuing to produce its environmental assessment as required by NEPA, which it did not complete until 2009. Furthermore, based on the results of the

environmental assessment, NEPA required additional compliance in the form of an environmental impact statement, which NDOT did not complete until the middle of 2010. Only at this point was it possible to reasonably conclude that Ad America's property would likely be needed in the future—18 years later.[10]

Even further, and in contrast to *Richmond Elks*, the loss of Ad America's tenants was theoretically influenced by Ad America highlighting NDOT's anticipated need of the property, as explained in Ad America's owner's affidavit, magnifying the effect of any generalized knowledge that the tenants might have had. Additionally, the reason there was public knowledge of Project Neon's anticipated need for Ad America's property was because NEPA required disclosure of the plans and the opportunity for public comment.[11] Making NDOT's compliance with federal law a basis for compensation to Ad America in these

---

[10]Although every development alternative publicly disclosed upon the completion of the environmental assessment required Ad America's property, federal funding—the means of making Project Neon a reality—hinged on the completion and acceptance of NDOT's environmental impact statement.

[11]NEPA requires projects to be submitted as a whole and not improperly segmented into subparts. *See* 40 CFR § 1502.4(a) ("Proposals or parts of proposals which are related to each other closely enough to be, in effect, a single course of action shall be evaluated in a single impact statement."); *Defenders of Wildlife v. N.C. Dep't of Transp.*, 762 F.3d 374, 394-95 (4th Cir. 2014); *see also California ex rel. Imperial Cnty. Air Pollution Control Dist. v. U.S. Dep't of the Interior*, 767 F.3d 781, 795 (9th Cir. 2014). Accordingly, NDOT could not have engaged in a piecemeal environmental assessment or impact process to avoid publicly disclosing the anticipated need for Ad America's property in the future.

circumstances would undermine long-term public projects by requiring comprehensive funding for all acquisitions at the planning stage, which would, in turn, unreasonably expedite the need for acquired property to be put to use. *Cf.* Nev. Const. art. 1, § 22, cl. 6 ("Property taken in eminent domain shall automatically revert back to the original property owner upon repayment of the original purchase price, if the property is not used within five years for the original purpose stated by the government.").

Finally, the record's minimal empirical evidence undermines Ad America's position. The decrease in Ad America's rental income in 2011 did not approach the loss suffered by Elks, and certainly did not "render[ ] the property unusable or valueless" to Ad America. *Stueve Bros.*, 737 F.3d at 759. Additionally, Ad America provides no evidence of fair market values or rental charges for similarly situated properties with which to determine any real decrease in the fair market value or economic use of the property. Thus, based on our nonregulatory analysis, we conclude that NDOT did not take Ad America's property within the meaning of the Fifth Amendment of the U.S. Constitution.

*Nevada takings jurisprudence*

Ad America insists that NDOT's actions constitute a taking under the Nevada Constitution and that our case law supports this conclusion. According to Ad America, in *City of Sparks v. Armstrong*, 103 Nev. 619, 748 P.2d 7 (1987), this court adopted an expanded takings approach that provides for just compensation when precondemnation activities are unreasonable or oppressive and diminish the market value of property. We now clarify that our decision in *Buzz Stew, LLC v. City of North Las Vegas*, 124 Nev. 224, 181 P.3d 670 (2008), corrected *Armstrong* inasmuch as *Armstrong* used our precondemnation damages standard to

award just compensation for a taking based on precondemnation activities.

The standard employed in *Armstrong* originated in our decision, *Sproul Homes of Nevada v. State, Department of Highways*, 96 Nev. 441, 611 P.2d 620 (1980). In *Sproul*, the plaintiff-appellant's inverse condemnation action for damages was dismissed for failure to state a claim for relief. 96 Nev. at 442, 611 P.2d at 620. We explained that to state an inverse condemnation action for damages, "'there must be an invasion or an appropriation of some valuable property right which the landowner possesses and the invasion or appropriation must directly and specially affect the landowner to his injury.'" *Id.* at 444, 611 P.2d at 621-22 (quoting *Selby Realty Co. v. City of San Buenaventura*, 514 P.2d 111, 114-15 (Cal. 1973)). Acknowledging that "not every decrease in market value as a result of precondemnation activities is compensable," the court also stated that when such activities are "unreasonable or oppressive and the affected property has diminished in market value as a result of the governmental misconduct, the owner of the property may be entitled to compensation." *Id.* at 444-45, 611 P.2d at 622 (citing *Klopping v. City of Whittier*, 500 P.2d 1345, 1355 (Cal. 1972)). Thus, *Sproul* discussed unreasonable or oppressive activities that diminished market value in the context of precondemnation damages only. *Id.*

*Sproul* clarified that the standards it announced and relied on were for claims of *damages* related to unreasonable and oppressive *precondemnation activities* (now called precondemnation damages), and not for just compensation for the fair market value of a property due to a taking. *Id.* at 442-45, 611 P.2d at 620-22. That *Sproul*, and necessarily *Armstrong*, employed our standard for precondemnation damages is

SUPREME COURT
OF
NEVADA

(O) 1947A

confirmed not only by the California cases upon which they relied, namely *Klopping* and *Selby*, but also by our later decisions relying on this standard and citing to *Sproul*. *See Buzz Stew*, 124 Nev. at 231 n.17, 181 P.3d at 674 n.17.; *State, Dep't of Transp. v. Barsy*, 113 Nev. 712, 720-21, 941 P.2d 971, 976 (1997), *overruled on other grounds by GES, Inc. v. Corbitt*, 117 Nev. 265, 21 P.3d 11 (2001). We therefore will not apply this standard to Ad America's takings claim and conclude that NDOT did not commit a taking under the Nevada Constitution.[12]

## *CONCLUSION*

Based on our analysis, we conclude that the undisputed material facts, as a matter of law, do not demonstrate that NDOT committed a taking of Ad America's property warranting just compensation. Therefore, we grant NDOT's writ petition. Summary judgment in favor of NDOT is warranted, but summary judgment in favor of Ad America is not. The clerk of this court shall issue a writ of mandamus instructing the district court to vacate its previous order and

---

[12]Given our conclusion that a taking did not occur, we do not address the parties' arguments concerning the valuation date for the taking.

enter a new order granting summary judgment in favor of NDOT on the inverse condemnation cause of action.[13]

_____, J.
Douglas

We concur:

_____, C.J.
Hardesty

_____, J.
Parraguirre

_____, J.
Cherry

_____, J.
Saitta

_____, J.
Pickering

_____

[13]We limit our holding to apply through December 14, 2012, the last date at which the district court heard arguments and considered evidence from the parties.

GIBBONS, J., concurring:

While I concur with the majority that NDOT was not directly or vicariously liable for the actions of the City of Las Vegas, this writ of mandamus only adjudicates the summary judgment motions of NDOT and Ad America. Any claims Ad America may have against the City of Las Vegas or any other third parties, together with any claims against NDOT which matured after December 14, 2012, remain outstanding.

_____, J.
Gibbons